FILED
United States Court of Appeals
Tenth Circuit

September 12, 2008

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

LARRY WEBER,

      Plaintiff – Appellee,

v.

GE GROUP LIFE ASSURANCE
COMPANY,

      Defendant – Appellant.

No. 07-5036

**Appeal from the United States District Court
for the Northern District of Oklahoma
(D.C. No. 05-CV-165-JHP)**

Joshua Bachrach, Rawle & Henderson, LLP, Philadelphia, PA, for the Defendant-Appellant.

Jon E. Brightmire, Doerner, Saunders, Daniel & Anderson, LLP, Tulsa, OK, for the Plaintiff-Appellee.

Before **TACHA, EBEL** and **MCCONNELL**, Circuit Judges.

**EBEL**, Circuit Judge.

      Defendant-Appellant General Electric Group Life Assurance Company

("GE") appeals from a summary judgment order obligating it to pay death

benefits to Plaintiff-Appellee Larry Weber, the widower of Shelley Clark Weber.

GE, the administrator and fiduciary of group insurance plans available to the employees of Winner Communications, Inc. ("Winner"), including Mrs. Weber, argues that Mrs. Weber was not eligible for the Voluntary Life Insurance coverage and also disputes the award of prejudgment interest. We affirm.

## I.    Background

Mrs. Weber began working for Winner in its marketing department on September 23, 2002. On March 7, 2003, Mrs. Weber completed a GE Enrollment Request form. Therein, she requested Life, Dental, Dependent Dental, Dependent Life, Medical, Dependent Medical, and Long Term Disability insurance. Mrs. Weber requested a Basic Life Insurance Benefits policy in the amount of $53,000 (twice her basic annual earnings). At the same time, Mrs. Weber, using a separate form, enrolled for Voluntary Life Insurance coverage from GE in the amount of $100,000. Mrs. Weber's enrollment application notes that she had been employed full time at Winner since September 23, 2002 with basic annual earnings of $26,500. Mrs. Weber listed Mr. Weber as the primary beneficiary.

### A. The Voluntary Life Insurance Policy

The terms of Mrs. Weber's Voluntary Life Insurance policy are set forth in a GE Group Certificate, which contained the terms of the Group Insurance Policy issued by GE to Winner and its eligible employees (for simplicity's sake, we will refer to the Certificate as the "Policy"). Part 1 of the Policy, the "Insurance Schedule," provides that there is no waiting period prior to eligibility for the

voluntary employee life insurance coverage. It also states that "[a]n Employee may elect an amount of insurance in increments of $10,000 to the lesser of $300,000 or five times Basic Annual Earnings, subject to a minimum of $20,000."

Part 2 lays out the Policy "Definitions." Three of those definitions impact this appeal. First, the Policy defines "Actively At Work" as follows:

> You are actively at work on any day if on that day you are:
> 1. Working at the Employer's usual place of business or at such place or places that the Employer's normal course of business may require;
> 2. Performing all of the duties of your job on a full-time basis; and
> 3. Not confined in any institution providing care or treatment of physical or mental infirmities.

Second, the policy defines an "Eligible Employee" as follows:

> Someone who under the terms of the policy:
> 1. Meets the requirements in the definition of Employee; and
> 2. Completes the waiting period (described in the "Date of Eligibility" section); and
> 3. Is working within the United States.

Lastly, the policy defines an "Employee" as follows:

> Someone who meets the following requirements:
> 1. Is an employee of the Employer, as stated in PART 1: Insurance Schedule;
> 2. Regularly works at least 30 hours per week at the Employer's usual place of business or at such place or places that the Employer's normal course of business may require, unless otherwise stated in PART 1: Insurance Schedule;
> 3. Is paid for such work in accordance with applicable Wage and Hour Laws; and
> 4. Is in a classification eligible for insurance as shown in the Employer's Plan of Insurance or as noted in the Insurance Schedule, if applicable.

- 3 -

In a Part 3 subsection entitled "Effective Date of Insurance," the Policy states, "Once you have met the Conditions of Insurability, you will be insured under the Policy on the latest of:

    1. The date you become eligible;
    2. The date we approve any Evidence of Insurability we require; or
    3. The date shown in our approval of your request for insurance."

The Policy cautions, "<u>You must, however, be Actively At Work on that date. Otherwise, you will be insured on the date you are again Actively At Work</u>" (emphasis added).

Lastly, the Policy states that GE "is a fiduciary, as that term is used in ERISA . . . ." More specifically, the Policy notes that, "[i]n this capacity, [GE] is charged with the obligation, and possesses discretionary authority to make claim, eligibility and other administrative determinations regarding those policies, and to interpret the meaning of their terms and language."

**B. Mr. Weber's Claim**

Mrs. Weber passed away on September 9, 2003. She was survived by her husband (the Appellee here) and her then 3-year-old son. On behalf of Mr. Weber, an insurance broker named E. Clark James sent GE a death claim for Mrs. Weber's Basic and Voluntary Life Insurance policies on September 23, 2003. Mr. James's letter attached a "Notice of Claim Proof of Death" form, which Janessa DeVore, Winner's Personnel Manager, completed on September 19, 2003. In that

form, Ms. DeVore noted that May 16, 2003, was Mrs. Weber's "Date Last Worked on a Full-time Basis" and certified under penalty of perjury that the information she supplied was "true, correct and complete."

Shortly thereafter, on October 13, 2003, GE paid out Mrs. Weber's Basic Life Insurance benefits to Mr. Weber.[1] However, in regard to the Voluntary Insurance benefits, GE requested additional documentation from Winner because "Ms. Weber's date of last active service (5/16/03) was so close to the effective date of the Voluntary Life Insurance coverage . . . (5/1/03)" that GE needed to verify that Mrs. Weber "was actively at work, working on a full-time basis, thirty hours or more per week on or after May 1, 2003."

Winner duly sent along documentation regarding Mrs. Weber's work at Winner. On October 28, 2003, Winner's Vice-President of National Sales, Sam Youngwirth, sent GE a letter documenting Mrs. Weber's duties as a Winner employee. He attached Winner's Payroll Register for Mrs. Weber from January 1, 2003, to May 31, 2003. Youngwirth also attached a series of e-mails from Mrs. Weber to Ms. DeVore that listed Mrs. Weber's hours worked. In an e-mail entitled "Hours worked May 1-15," Mrs. Weber states that she worked 5 hours on

---

[1]As GE notes, the Basic Life coverage was a continuation of coverage previously offered by Winner to its employees. Thus, GE did not dispute Mrs. Weber's eligibility for the "basic" death benefits.

Monday May 12, 4 hours on May 13, 5 hours on May 14 and 5 hours on May 15.[2] Despite this documentation, an insurance broker working with Mr. Weber advised GE that he believed that Mrs. Weber had worked up until two weeks prior to her death.

GE denied Mr. Weber's claim in a letter dated December 3, 2003. Therein, GE explained that Mrs. Weber was never eligible for the Voluntary Life Insurance coverage because she was not a "full-time employee, Actively At Work as defined by the policy at the employer's usual place of business, performing all the duties of her job on a full-time, 30 hour per week basis" after the May 1, 2003, effective date for the policy. The denial letter noted that GE based its decision on the documentation it requested from Winner and on the Policy. Having explained the decision to deny the claim, GE invited Mr. Weber to submit any documentation that might alter the determination.

Mr. Weber, through counsel, protested the denial in a letter dated August 10, 2004, but submitted no new documentation.[3] GE responded on September 9, 2004. GE maintained that Mrs. Weber's failure to work at least 30 hours a week

_____

[2]Perhaps because of Winner's payroll periods, Mrs. Weber did not state in this e-mail whether she worked on Friday May 16, despite the fact that she sent the e-mail on May 19. In another e-mail that is in the administrative record, Mrs. Weber noted that she did not work the week of April 28 because she was undergoing tests and also did not work the week of May 4 because she was in the hospital.

[3]GE concedes that this letter – and GE's response thereto – satisfy the administrative exhaustion requirement.

after May 1, 2003, doomed her claim for coverage.  Specifically, GE stated that, "[b]ased on the information we have received to date, Ms. Weber did not work at least 30 hours a week, on or after the policy effective date of May 1, 2003, and was not eligible for coverage under the policy."  GE thus reiterated the determinative rationale identified in its initial decision.

**C. Mr. Weber's Lawsuit**

Mr. Weber filed suit in Oklahoma state court in March 2005 against GE and the insurance brokers with whom he had dealt.[4]  GE promptly removed the case to federal court, asserting that Mr. Weber's state causes of action – for breach of contract, promissory estoppel, bad faith breach of contract, and breach of fiduciary duty – sought recovery under an employee welfare benefit plan and, therefore, were preempted by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1461.[5]  Simultaneously, GE moved the federal court to dismiss the complaint based on ERISA preemption.  Mr. Weber countered that GE had failed to show that ERISA governs the Voluntary Life

[4]Naming the brokers as defendants defeated federal diversity jurisdiction because Mr. Weber and the brokers are Oklahoma residents.

[5]ERISA "is a comprehensive statute designed to promote the interests of employees and their beneficiaries in employee benefit plans.  It covers both employee pension plans and welfare plans that meet its definitions under 29 U.S.C. § 1002(1)-(3)."  Felix v. Lucent Techs., Inc., 387 F.3d 1146, 1153 n.5 (10th Cir. 2004) (quotations, citation omitted).  ERISA permits plaintiffs to sue to "recover benefits due . . . under [an employee benefit] plan, to enforce . . . rights under the terms of the plan, or to clarify . . . rights to future benefits under the terms of the plan."  29 U.S.C. § 1132(a)(1)(B).

Insurance plan and contended that the plan fell within the 29 C.F.R. § 2510.3-1(j) safe harbor.[6]  Because GE premised its removal on federal question jurisdiction, Mr. Weber asked the court to remand the case to the state court.

In August 2005, the district court held that ERISA governed Mr. Weber's claims and directed Mr. Weber to file an Amended Complaint.  Mr. Weber complied, amending his complaint to include two ERISA claims alongside two state claims; GE answered.  Mr. Weber then filed a motion to remand the case on May 9, 2006, arguing that ERISA did not govern the dispute because the Voluntary Life Insurance policy fell within the 29 C.F.R. § 2510.3-1(j) safe harbor exemption from ERISA's umbrella.  In support, Mr. Weber offered fourteen exhibits, including (1) portions of the depositions of a Winner human resources employee and the insurance brokers, (2) Winner's Benefit Plan Description packet, and (3) various documents eventually produced by GE in the

---

[6]This regulation, promulgated by the Department of Labor, exempts certain plans from ERISA's definition of "employee welfare benefit plan," 29 U.S.C. § 1002(1), and therefore exempts such plans from ERISA's regulatory reach, see, e.g., Gaylor v. John Hancock Mut. Life Ins. Co., 112 F.3d 460, 463 (10th Cir. 1997).  Specifically, § 2510.3-1(j) provides that a group or group-type insurance program offered by an employer will not be deemed an "employee welfare benefit plan" if (1) no contributions are made by the employer, (2) employee participation in the program is voluntary, (3) the employer's only role is to permit the insurer to publicize the program to its employees and to collect and remit premium payments to the insurer, and (4) the employer receives no consideration from the employee aside from compensation for administrative services rendered in connection with the remittance of premium payments.  29 C.F.R. § 2510.3-1(j); see also Gaylor, 112 F.3d at 463.

administrative record.  Just a few days after he moved for a remand, Mr. Weber settled with the non-diverse insurance brokers.

The district court refused to remand the case in a minute order dated June 30, 2006.  Therein, the district court noted that the "only issue remaining is ERISA," and set a new schedule for the case.  GE filed the administrative record with the district court on July 31, 2006.  Mr. Weber thereafter moved for summary judgment.  Subsequently, based on the administrative record, the court granted Mr. Weber's motion for summary judgment.

In its order granting Mr. Weber's motion for summary judgment, the court concluded that GE had acted arbitrarily and capriciously in denying Mr. Weber death benefits.  The court found that "Ms. Weber met the 'Actively at Work' definition, at the latest, on May 12, 2003."  The court rejected GE's interpretation of the Policy, explaining that the plain language of the "Actively At Work" definition did not require an employee also to have worked 30 hours per week after the effective date.  Nor could GE argue, the court concluded, that the "Actively at Work" definition mandated that Mrs. Weber "work full time for a single day."  Furthermore, the court also noted that "clearer language was available to GE if it intended to inform an employee that 30 hours per week was required," but that GE had not used such language.  In sum, the court concluded

that GE's interpretation of the Policy was arbitrary and its determination unreasonable.[7]

In response to Mr. Weber's motion to alter or amend its judgment, the district court finalized its judgment on June 28, 2007, awarding $169,274.00 to Mr. Weber. This figure included the $100,000 in Voluntary Life Insurance benefits, augmented by prejudgment interest at the rate of 15%. This appeal by GE followed.

## II. Discussion

### A. Jurisdiction

At the threshold, we address an issue that Mr. Weber failed to cross-appeal but that he cloaks in a jurisdictional mantle. In his Answer Brief, Mr. Weber reiterates his contention – which he raised repeatedly throughout the district court proceedings – that ERISA does not preempt his state-law claims because the Voluntary Life Insurance policy at issue falls within the scope of the 29 C.F.R. § 2510.3-1(j) safe harbor. Thus, he argues that removal was improper because there

---

[7]Additionally, the court scolded GE for insinuating that Mrs. Weber never worked after May 15, 2003. The court noted that Mr. Weber had appended to his motion for summary judgment e-mails from Mrs. Weber to Ms. DeVore detailing her hours worked during June and July of 2003. However, because those e-mails were not made part of the administrative record, the court "expressly state[d] that it ha[d] not considered [the e-mails] or the additional hours worked by Ms. Weber in reaching [its] decision." For the reasons discussed below, we also have not considered those e-mails.

was no federal question at the time the case was removed which would have supported the federal court's original exercise of subject-matter jurisdiction.

Mr. Weber's argument is crippled by his failure to cross-appeal the district court's decision denying remand after the removal. Absent a cross-appeal, we have "no jurisdiction to consider," Trigalet v. Young, 54 F.3d 645, 647 n.3 (10th Cir. 1995), an issue determined adversely to the appellee unless resolution of that issue would not enlarge the appellee's rights or diminish the appellant's. Fischer-Ross v. Barnhart, 431 F.3d 729, 733 n.2 (10th Cir. 2005) ("[W]ithout taking a cross appeal . . . an appellee claiming error may not attack the decree with a view either to enlarging h[is] own rights thereunder or of lessening the rights of h[is] adversary." (quotation omitted)); see also Couture v. Bd. of Educ. of Albuquerque Pub. Schs., — F.3d —, 2008 WL 3092955, *5 (10th Cir. Aug. 7, 2008). Mr. Weber's argument has the potential to enlarge his rights because, under Oklahoma tort theories, Mr. Weber could pursue punitive damages against GE. See Okla. St. tit. 23, § 9.1 (setting conditions for the award of punitive damages in tort actions); see also Badillo v. Mid Century Ins. Co., 121 P.3d 1080, 1105-06 (Okla. 2005) (applying § 9.1 in context of insurance dispute). In fact, in his original state court petition, Mr. Weber did just that. As discussed below in section II.C, Mr. Weber cannot pursue such damages under ERISA.

While we have a well-established duty to consider jurisdictional issues even if we must raise them sua sponte, Mr. Weber's argument does not implicate

our subject-matter jurisdiction. GE notes that just a few days after Mr. Weber

filed his motion to remand, he settled with the insurance brokers (the non-diverse

parties). At that point, the remaining parties were "citizens of different States"

and "the matter in controversy exceed[ed] the sum or value of $75,000." 28

U.S.C. § 1332(a)(1).[8] Thus, we have diversity jurisdiction.

---

[8]Typically "all challenges to subject-matter jurisdiction premised upon diversity" must be measured "against the state of facts that existed at the time of filing," Grupo Dataflux v. Atlas Global Group, L.P., 541 U.S. 567, 571 (2004), but an exception to that rule adheres here. "[I]t is well-settled that [Fed. R. Civ. P.] 21 invests district courts with authority to allow a dispensable nondiverse party to be dropped at any time . . . ." Id. at 572-73 (quoting Newman-Green, Inc. v. Alfonzo-Larrain, 490 U.S. 826, 832 (1989)). Moreover, Newman-Green held that "courts of appeals also have the authority to cure a jurisdictional defect by dismissing a dispensable nondiverse party." Id. at 573; see also Newman-Green, 490 U.S. at 837; cf. United States ex rel. General Rock & Sand Corp. v. Chuska Dev. Corp., 55 F.3d 1491, 1495 (10th Cir. 1995) ("[W]e recognize that both the district court and this court may consider the voluntary dismissal of nondiverse defendants as a means of preserving diversity.").

While the dismissal upheld in Newman-Green was sought by Rule 21 motion, 490 U.S. at 829, that Rule provides, "[o]n motion or on its own, the court may at any time, on just terms, add or drop a party." Fed. R. Civ. P. 21 (emphasis added); see also Bhatla v. U.S. Capital Corp., 990 F.2d 780, 786 (3d Cir. 1993) (dismissing, sua sponte, "action against the nondiverse, dispensable parties so that [the rest of the appeal] otherwise may continue"). "Although the Federal Rules of Civil Procedure strictly apply only in the district courts, the policies informing Rule 21 may apply equally to the courts of appeals." Newman-Green, 490 U.S. at 832 (citation omitted). The Newman-Green Court came to its conclusion, in part, because of its reluctance to force the plaintiff "to jump through . . . judicial hoops merely for the sake of hypertechnical jurisdictional purity." Id. at 837. But the Court cautioned that the "authority [to dismiss a dispensable nondiverse party] should be exercised sparingly," id., and required the court to "consider whether the dismissal of a nondiverse party will prejudice any of the parties in the litigation," id. at 838.

From the district court docket, it is not clear that the district court acted on the parties' stipulation of dismissal regarding the nondiverse insurance brokers.

(continued...)

- 12 -

The district court twice determined that ERISA completely preempted Mr. Weber's state claims, see Metro. Life Ins. Co. v. Taylor, 481 U.S. 58, 63-67 (1987); Felix, 387 F.3d at 1154-55, and Mr. Weber did not cross-appeal these decisions. As a result, we cannot consider Mr. Weber's renewal of his remand argument. Cf. Roe v. Cheyenne Mountain Conference Resort, Inc., 124 F.3d 1221, 1227 (10th Cir. 1997) ("[A]rguments which would lead to the vacation of the judgment below and the partial relief awarded to the plaintiff may not be heard" because defendants failed to cross-appeal.). We exercise appellate jurisdiction pursuant to 28 U.S.C. § 1291.[9]

**B. Mrs. Weber's Eligibility for Benefits**

GE advances two interrelated arguments for overturning the district court's summary judgment decision. First, GE argues that Mrs. Weber was never eligible

---

[8](...continued)
It is clear that those parties were, for all intents and purposes, dismissed and that the unanimous will of the parties was that the district court dismiss the brokers. We discern this will from the fact that (1) the parties stipulated to the dismissal of the brokers, (2) the caption of the judgment entered below did not refer to the brokers, and (3) the brokers are not listed as parties to this appeal. We therefore exercise our authority under Newman-Green and DISMISS E. Clark James, John James, and James & Associates. Having done so, we have "cured the jurisdictional defect" by effecting the "[t]he postsettlement dismissal of the diversity-destroying defendant[s]." Grupo-Dataflux, 541 U.S. at 573 (explaining Caterpillar Inc. v. Lewis, 519 U.S. 61, 73 (1996)).

[9]Mr. Weber also asserts in his Answer Brief that GE's appeal should be dismissed under Tenth Circuit Rules 30.1(A)(1) and 10.3(D)(2) because the Appellant supplied a deficient appendix. GE's appendix includes the administrative record, the only critical documents for purposes of GE's appeal. As such, Mr. Weber's argument lacks merit.

for the Voluntary Life Insurance coverage because she did not work 30 hours per week after the May 1, 2003, effective date. Second, GE argues that Mrs. Weber was never actively at work after May 1, 2003. We hold that, under our proper standard of review, GE's interpretation of the Policy's eligibility and actively at work language was arbitrary.

### 1. Standard of Review

We review summary judgment orders de novo. Flinders v. Workforce Stabilization Plan of Phillips Petroleum Co., 491 F.3d 1180, 1189 (10th Cir. 2007). We accord no deference to the district court's decision. See Sandoval v. Aetna Life & Cas. Ins. Co., 967 F.2d 377, 380 (10th Cir. 1992). Like the district court, we must first determine the appropriate standard to be applied to GE's decision to deny benefits. See Fought v. Unum Life Ins. Co. of Am., 379 F.3d 997, 1002 (10th Cir. 2004).

ERISA providers may "retain the authority to interpret ambiguous provisions in a plan." Miller v. Monumental Life Ins. Co., 502 F.3d 1245, 1250 (10th Cir. 2007). Where an ERISA provider has, in fact, retained this authority "in explicit terms, we employ a deferential standard of review," id., asking only whether the denial of benefits was arbitrary and capricious, Flinders, 491 F.3d at 1189; cf. Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989) ("[W]e hold that a denial of benefits . . . is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority

to determine eligibility for benefits or to construe the terms of the plan."). Under the arbitrary and capricious standard, we curtail our review, asking only whether the interpretation of the plan "was reasonable and made in good faith." Flinders, 491 F.3d at 1189 (quoting Fought, 379 F.3d at 1003).

However, we dial back our deference if "a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest." Metro. Life Ins. Co. v. Glenn, 128 S. Ct. 2343, 2348 (2008) (quoting Firestone, 489 U.S. at 115). In such a situation, that "conflict should be weighed as a factor in determining whether there is an abuse of discretion."[10] Id. at 2350 (internal quotation marks omitted) (quoting Firestone, 489 U.S. at 115); see also Flinders, 491 F.3d at 1189-90. To incorporate this factor, we have "crafted a 'sliding scale approach' where the 'reviewing court will always apply an arbitrary and capricious standard, but [will] decrease the level of deference given . . . in proportion to the seriousness of the conflict.'" Flinders, 491 F.3d at 1190 (quoting Chambers v. Family Health Plan Corp., 100 F.3d 818, 825-26 (10th Cir. 1996)). This approach mirrors the Glenn Court's method of accounting for the conflict-of-interest factor. See Glenn, 128 S. Ct. at 2351-52 (explaining that factor should prove more or less important depending on the conflict of interest's magnitude).

---

[10]This court "treat[s] the terms 'arbitrary and capricious' and 'abuse of discretion' as interchangeable in this context." Fought, 379 F.3d at 1003 n.2.

Here, the Policy explicitly states that GE "is a fiduciary, as that term is used in ERISA . . . ." Additionally, "[i]n this capacity, [GE] is charged with the obligation, and possesses discretionary authority to make claim, eligibility and other administrative determinations regarding those policies, and to interpret the meaning of their terms and language." GE thereby retained discretionary authority, which triggers this court's arbitrary and capricious standard of review. As both the insurer and the plan administrator, GE operates under a conflict of interest in this case. See Glenn, 128 S. Ct. at 2349-50. Accordingly we will still employ the arbitrary and capricious standard, but we will weigh GE's conflict of interest as a factor in determining the lawfulness of the benefits denial.

Lastly, "in reviewing a plan administrator's decision under the arbitrary and capricious standard, the federal courts are limited to the administrative record – the materials compiled by the administrator in the course of making his decision." Fought, 379 F.3d at 1003 (internal quotation omitted).

2. GE's Interpretation of the Policy

"[W]hen reviewing a plan administrator's decision to deny benefits, we consider only the rationale asserted by the plan administrator in the administrative record and determine whether the decision, based on the asserted rationale, was arbitrary and capricious." Flinders, 491 F.3d at 1190. We make that determination based on the language of the plan. Accordingly, as the first step towards "interpreting an ERISA plan," we scrutinize the "plan documents as a

whole and, if unambiguous, construe them as a matter of law." Miller, 502 F.3d at 1250 (quoting Admin. Comm. of the Wal-Mart Assocs. Health & Welfare Plan v. Willard, 393 F.3d 1119, 1123 (10th Cir. 2004)). In making this determination, we "consider the common and ordinary meaning as a reasonable person in the position of the plan participant, not the actual participant, would have understood the words to mean." Id. (internal quotation marks omitted) (quoting Willard, 393 F.3d at 1123) (emphasis added).

If the language is ambiguous, then we "must take a hard look and determine" whether GE's decision was arbitrary in light of its conflict of interest. Fought, 379 F.3d at 1008. As part of this review, we "typically consider whether: (1) the decision was the result of a reasoned and principled process, (2) is consistent with any prior interpretations by the plan administrator, (3) is reasonable in light of any external standards, and (4) is consistent with the purposes of the plan." Flinders, 491 F.3d at 1193 (internal quotations omitted); see also Geddes v. United Staffing Alliance Employee Med. Plan, 469 F.3d 919, 929 (10th Cir. 2006). Neither party addresses these questions specifically and the record reveals little about GE's claims assessment process, so we are left to our own analytic devices.

> *a. Whether it was arbitrary and capricious for GE to conclude that the Policy's "30 hours per week" requirement establishes that Mrs. Weber was ineligible for the Voluntary Life Insurance coverage*

- 17 -

Relying on the definition of "Employee," GE emphasizes that, to qualify as an "Employee," a person must "[r]egularly work[] at least 30 hours per week at the Employer's usual place of business . . . ." GE then assumes that this 30-hour-per-week requirement was a condition precedent to coverage that could be satisfied only <u>after</u> the effective date. GE justifies this assumption by connecting the Policy's definitions of "Employee," "Eligible Employee," "Actively At Work," and "Effective Date of Insurance."

First, we consider the "Effective Date of Insurance" provision, which states, "[o]nce you have met the Conditions of Insurability, you will be insured under the Policy on . . . [t]he date you become eligible." In addition, however, the employee "must . . . be Actively At Work on that date." Thus, the effective date provision has three broader requirements: meeting the Conditions of Insurability, becoming "eligible," and being "Actively At Work." We review each requirement in turn.

The Policy lists two pertinent Conditions of Insurability: the employee must (1) "[s]atisfy the Waiting Period shown in the Insurance Schedule" and (2) "[c]omplete and submit one of our enrollment forms." It is undisputed that the Policy states that there is no waiting period and that Mrs. Weber completed an enrollment form.

Next, we consider whether Mrs. Weber became "eligible." While this term is not capitalized, we will assume that it refers to the defined term "Eligible

- 18 -

Employee."  An "Eligible Employee" is one who (1) "[m]eets the requirements in the definition of Employee," (2) "[c]ompletes the waiting period," and (3) is working in the United States.  Only the first prong of this definition is at issue. In pertinent part, the term "Employee" encompasses "[s]omeone who . . . [r]egularly works at least 30 hours per week at the Employer's usual place of business . . ."  (emphasis added).

Mrs. Weber was hired and assigned to work a 40-hour week.  Her employer certified she was a regularly employed, full-time employee through May 16, 2003.  Mrs. Weber's time sheets, which Winner provided to GE, confirm as much. They reveal that Mrs. Weber regularly worked 40-hour weeks before May 2003. Thus, she "regularly" worked at least 30 hours a week.[11]  That illness or vacation might irregularly interrupt an employee's regular assignment does not change the "regular" work experience of an employee.

Of course, GE received reports from Winner that Mrs. Weber worked less than 30 hours per week during a few weeks after May 1.  That is not enough, however, to cast doubt on the other evidence in the administrative record that Mrs. Weber "regularly" worked at least 30 hours a week prior to May 1, the

---

[11]In addition, the administrative record contains two notes wherein a GE employee identified only as "Marie" apparently confirms that GE considered Mrs. Weber a full-time employee of Winner.  The first note, dated October 2, 2003, states simply, "Calling John James [Mrs. Weber's insurance broker] to discuss claim for [Mrs. Weber]."  In pertinent part, the second (written just a few days later) says, "full time – yes."

effective date of insurance. Nothing in the definition of Employee suggests that eligibility is limited to those who regularly work at least 30 hours a week <u>after May 1</u>. If GE intended to require that the employee <u>actually</u> work 30 hours per week after the effective date to be an eligible employee, it "had every opportunity to add" specific language to that effect. <u>Fought</u>, 379 F.3d at 1013. But because GE did not do so, it would be "unreasonable to allow [GE] to do so <u>post facto</u> . . . ." <u>Id.</u> Moreover, we note that the Voluntary Life Enrollment Application that Mrs. Weber completed on March 7, 2003, requires the employee to certify, "I am employed by the employer listed and <u>at present am working at least 30 hours per week for this employer at the regular place of business</u>" This language confirms that the "30 hours a week" requirement may be satisfied prior to the effective date.

Because Mrs. Weber unequivocally met the Policy's definition of Employee, GE's denial of benefits on the ground that she never satisfied that definition was arbitrary and capricious.

*b. Whether it was arbitrary and capricious for GE to conclude that Mrs. Weber was not "Actively At Work" after the effective date of the Policy*

Having concluded that Mrs. Weber was an eligible employee, we turn now to GE's argument that Mrs. Weber's Voluntary Life Insurance coverage was never triggered because she was not "Actively At Work" after May 1, the effective date of the coverage. In this regard, GE again maintains that, in order to be covered,

Mrs. Weber had to work at Winner at least 30 hours per week after May 1 so as to satisfy the Policy's requirement that she be "performing all of the duties of [her] job on a full-time basis." We reject this reading of the Policy as arbitrary and capricious.

Pursuant to the Policy's "Effective Date of Insurance" section, an employee that has met the Conditions of Insurability "will be insured under the policy on the" date she "become[s] eligible" provided she is "Actively At Work on that date," or on a later date when she is "again Actively At Work." An employee is "Actively At Work" if "<u>on any day</u>" she is:

> 1. Working at the Employer's usual place of business or at such place or places that the Employer's normal course of business may require;
> 2. <u>Performing all of the duties of [her] job on a full-time basis</u>; and
> 3. Not confined in any institution providing care or treatment of physical or mental infirmities.

(Emphasis added).

The plain language of the "Actively At Work" provision does not require that the employee work any set number of hours, either on a particular day or over the course of a particular week. We can quickly dismiss GE's contention that this language required Mrs. Weber to work more than 30 hours in any week after the effective date. Tellingly, the "Actively At Work" definition states that the employee can fulfill its requirements "<u>on any day</u>" when the employee meets the three prongs. And we also reject GE's contention that the "Actively At Work" requirement mandated that Mrs. Weber work an 8-hour day (or even a 6-

- 21 -

hour day) after May 1. Coverage under the Policy hinges on whether the employee is "performing all of [her] duties . . . on a full-time basis." This language simply does not equate to a requirement that the employee perform all of her duties for a full work day or clock-in and actually work a set number of hours on any day – it only requires that work be performed according to the employee's duties on a full-time "basis."

Here, the evidence establishes that Mrs. Weber was actively at work shortly after May 1. Specifically, the administrative record reveals that Mrs. Weber was at work on May 12, 13, 14, and 15. The record also reveals that Winner considered Mrs. Weber a full-time employee on those days. Thus, she was at work on a "full-time basis." Although Mrs. Weber did not work 8 hours per day on any of those four days, she was nonetheless performing the duties of her job on a "full-time basis." Nothing in the administrative record suggests otherwise. The only consequence of the fact that Mrs. Weber did not work from May 1 until May 12 is that the Policy became effective, at the latest, on May 12 rather than on the May 1 effective date.

In reaching this conclusion, we are persuaded by the reasoning of the Fourth Circuit in Tester v. Reliance Standard Life Insurance Co., 228 F.3d 372 (4th Cir. 2000). The Tester court explained that "the proper inquiry for considering whether [the decedent] was an 'active, Full-time employee' under the policy at the time of her death depends on whether or not she worked at [her job]

on a <u>regular basis despite her sick leave</u>." <u>Id.</u> at 377 (emphasis added). Under this inquiry, we have little doubt that Mrs. Weber was an active, full-time employee after May 1 despite her sick leave. While the <u>Tester</u> court was employing the de novo standard of review, <u>see id.</u> at 375, we are still swayed by its reasoning.

Our understanding of Mrs. Weber's Policy also finds some support in <u>Bartlett v. Martin Marietta Operations Support, Inc. Life Insurance Plan</u>, 38 F.3d 514 (10th Cir. 1994). There, the policy in question stated that an employee is "considered a full-time employee if [he is] regularly scheduled to work 40 hours in a week . . . ." <u>Id.</u> at 516. Prior to the effective date of his life insurance coverage, the employer placed the employee on a medical leave of absence. <u>Id.</u> The employee never returned to work before his death, but his widow sought death benefits under the plan. <u>Id.</u> at 515-16. The administrator argued that "'regular full-time' is synonymous with 'active.'" <u>Id.</u> at 517. Thus, the administrator asserted, the employee was not eligible for the life insurance coverage because he was not an "active" employee after the effective date. <u>Id.</u>

This court rejected the administrator's argument: "[i]f the defendant wanted to limit benefits to regular full-time employees who were actively working, it could have done so." <u>Id.</u> Since it had not, the court was "obliged to give terms their plain meaning" and therefore decided that an employee out on disability leave was not precluded "from still being one of the company's regular full-time

employees." Id. at 518. In so holding, the court noted that the employee "was hired as a regular full-time employee and was still shown to be a regular full-time employee in the company's personnel records before his death." Id. at 519; see also Lauder v. First Unum Life Ins. Co., 284 F.3d 375, 379-80 (2d Cir. 2002).

Here, unlike in Bartlett, the Policy does include an active work requirement. But Mrs. Weber met that requirement by reporting to work and working on a full-time basis for four days during the week of May 12, 2003. Critically, despite GE's insistence that the employer's classification of the employee is irrelevant, the Bartlett court considered such evidence as a factor in deciding whether an employee was working on a full-time basis. Bartlett, 38 F.3d at 519; cf. Lauder, 284 F.3d at 379-80 (noting that employer considered employee covered by disability benefits insurance on date of her accident).[12] Similarly, in Lauder, the employee worked her full final day on November 1, 1999. After leaving work that day, she slipped and fell in a convenience store parking lot. 284 F.3d at 379. Applying de novo review to the administrator's decision to deny

_____

[12]We recognize that looking to the employer's classification of the employee risks collusion between the employer and employee to the detriment of the insurer. But the insurer can easily obviate this concern by including clearer language in its policies. Moreover, accepting GE's view would give rise to an obvious equitable problem when the employer regards the employee as full-time and communicates as much to the employee, but the insurer subsequently disagrees with the employer's classification. This case highlights that potential problem: the plain language of the Policy would not have put Mrs. Weber on notice that she was not eligible or actively at work. Cf. Geddes, 469 F.3d at 930 (noting concern that "[n]othing in the Plan document alerts beneficiaries to this significant limitation on their . . . coverage").

coverage, id., the Second Circuit concluded that she was still an active employee after leaving work that day, factoring in her expectations as well as her employer's classification of her employment, id. at 379-80.

Furthermore, our reading of the Policy is necessary to give the "Waiting Period: None" language of the Insurance Schedule any meaning whatsoever.[13] Cf. Geddes, 469 F.3d at 930 (rejecting as arbitrary a plan administrator's interpretation of Policy language that would render the language "virtually meaningless"). Requiring an employee to work a 30-hour week after the effective date of the Policy would be to impose a waiting period, contrary to this express provision of the Policy.

GE argues that Mrs. Weber never worked on a "full-time basis" after May 1 and relies on a series of decisions where the employee was not considered "actively at work." However, in each, the employee never returned to work at all

_____

[13]Indeed, while the policy purports to have no "waiting period," under GE's interpretation of the Policy, GE can impose a de facto waiting period on participants by concluding that they have not "[r]egularly work[ed] at least 30 hours per week" after the effective date.

A hypothetical may illustrate this point: If an employee who had regularly worked 40 hours per week for 20 years prior to the effective date, showed up for work on the effective date and worked five hours before he had an incapacitating accident, would he be deemed ineligible? We conclude it would be arbitrary for the administrator to deny the employee benefits. But see Turner v. Safeco Life Ins. Co., 17 F.3d 141, 144 (6th Cir. 1994) (concluding that, where plan phrase "'regular full time employees' is qualified by the words 'working a minimum of 30 hours each week,'" the policy "speaks of regular full time employees who are working a minimum of 30 hours a week now – not employees who worked 30 hours a week before the policy became effective").

after the pertinent coverage's effective date.  See Baker v. Metro. Life Ins. Co., 364 F.3d 624, 626 (5th Cir. 2004) (employee went on medical leave in November 1998 but attempted to sign up for benefits with January 1, 1999, effective date); Glass v. United of Omaha Life Ins. Co., 33 F.3d 1341, 1344 (11th Cir. 1994); (employee went on leave four months before effective date and never returned to work); Edwards v. Great-West Life Assur. Co., 20 F.3d 748, 749 (7th Cir. 1994) (employee was in coma on effective date); Elsey v. Prudential Ins. Co. of Am., 262 F.2d 432, 433-34 (10th Cir. 1958) (effective date fell on a Saturday and employee's last day was the previous Friday).  Here, Mrs. Weber returned to work after the effective date and worked on a full-time basis.  Because she was "Actively At Work" after the effective date, Mrs. Weber was covered by the Policy, and GE's decision to deny Mr. Weber death benefits was arbitrary.

*c. The Appropriate Remedy*

Having concluded that GE's decision was arbitrary, "we may either remand the case to the plan administrator for a renewed evaluation of the claimant's case or we may order an award of benefits." Flinders, 491 F.3d at 1194.  This determination hinges on the nature of the flaws in the administrator's decision. Id.  Where the "administrator failed to make adequate factual findings or failed to adequately explain the grounds for the decision, then the proper remedy is to remand the case . . . .  In contrast, if the evidence in the record clearly shows that

the claimant is entitled to benefits, an order awarding such benefits is appropriate." Id.

On this record, the district court correctly decided to award Mr. Weber the death benefits. As explained above, GE's interpretation of the eligibility and actively at work requirements was unreasonable. Under any reasonable interpretation of the Policy, Mrs. Weber was eligible for coverage based on her work at Winner during the week of May 12.

### C. The Prejudgment Interest

The district court awarded Mr. Weber prejudgment interest and tied this award to the rate specified by Oklahoma law (15% per annum). GE challenges that award, contending that the award is punitive and therefore unlawful under this court's ERISA jurisprudence. "We review a district court's award of prejudgment interest to an ERISA plaintiff for an abuse of discretion." Allison v. Bank One-Denver, 289 F.3d 1223, 1243 (10th Cir. 2002).

Under ERISA, "[p]rejudgment interest is . . . available in the court's discretion." Benesowitz v. Metropolitan Life Ins. Co., 514 F.3d 174, 176 (2d Cir. 2007); see also Allison, 289 F.3d at 1243 ("The award of prejudgment interest is consider proper in ERISA cases."). This is because ERISA permits a participant to seek "appropriate equitable relief." 29 U.S.C. § 1132(a)(3)(B); see also Allison, 289 F.3d at 1243 ("Prejudgment interest is appropriate when its award serves to compensate the injured party and its award is otherwise equitable.").

Calculation of the rate for prejudgment interest also "rests firmly within the sound discretion of the trial court." Caldwell v. Life Ins. Co. of N. Am., 287 F.3d 1276, 1287 (10th Cir. 2002); id. at 1287-88 (rejecting argument that 28 U.S.C. § 1961(a) rate should be applied in context of ERISA claim for prejudgment interest). Courts commonly look to state statutory prejudgment interest provisions as guidelines for a reasonable rate. See, e.g., Allison, 289 F.3d at 1244 (holding that "district court did not abuse its discretion in awarding prejudgment interest at the Colorado statutory rate of 8 percent"); cf. Cottrill v. Sparrow, Johnson & Ursillo, Inc., 100 F.3d 220, 224-25 (1st Cir. 1996) (noting that because "ERISA is inscrutable on the subject" of the appropriate rate of prejudgment interest, "courts have discretion to select an appropriate rate, and they may look to outside sources, including state law, for guidance").

Nevertheless, this court has "held squarely that punitive damages are not available in an ERISA action" and that "an excessive prejudgment interest rate [which] would overcompensate an ERISA plaintiff, thereby transform[s] the award of prejudgement interest from a compensatory damage award to a punitive one." Allison, 289 F.3d at 1243 (quoting Ford v. Uniroyal Pension Plan, 154 F.3d 613, 618 (6th Cir. 1998)).

Here, the district court looked to Oklahoma law to determine the appropriate rate of prejudgment interest. Under Oklahoma law,

[it] shall be the duty of the insurer, receiving a proof of loss, to submit a written offer of settlement or rejection of the claim to the insured within ninety (90) days of receipt of that proof of loss. Upon a judgment rendered to either party, costs and attorney fees shall be allowable to the prevailing party. For purposes of this section, the prevailing party is the insurer in those cases where judgment does not exceed written offer of settlement. In all other judgments the insured shall be the prevailing party. If the insured is the prevailing party, the court in rendering judgment shall add interest on the verdict at the rate of fifteen percent (15%) per year from the date the loss was payable pursuant to the provisions of the contract to the date of the verdict.

Okla. St. Ann. tit. 36, § 3629(B).

GE contends that this Oklahoma law provides the appropriate rate where the insurer has acted in bad faith. Accordingly, GE reasons that it amounts to a punitive rate of interest. However, "[r]ecovery under § 3629(B) embraces both contract- and tort-related theories of liability so long as the insured loss is the core element of the prevailing litigant's recovery." Taylor v. State Farm Fire & Cas. Co., 981 P.2d 1253, 1262 (Okla. 1999). Because (1) the § 3629 prejudgment interest rate is of broad applicability – and is not necessarily punitive – and (2) nothing in the record suggests that the award of 15% here is punitive, we conclude that the district court did not abuse its discretion in awarding the prejudgment interest in this case. See Fox v. Fox, 167 F.3d 880, 884 (4th Cir. 1999) (upholding district court's award of 12% prejudgment interest in ERISA case); Smith v. Am. Int'l Life Assur. Co. of N.Y., 50 F.3d 956, 957-59 (11th Cir. 1995) (same); Biava v. Insurers Admin. Corp., 48 F.3d 1231 (table), 1995 WL 94461, at *5-*6 (10th Cir. Mar. 1, 1995) (unpublished) (upholding award of

prejudgment interest in ERISA case at 15% rate provided for under New Mexico law); <u>Florence Nightingale Nursing Serv., Inc. v. Blue Cross/Blue Shield of Ala.</u>, 41 F.3d 1476, 1484 (11th Cir. 1995) (upholding prejudgment interest at rate of 18% per annum by reference to Alabama law).

## III.  CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the district court.