**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 9, 2009**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

LILIRAE SMITH,

      Plaintiff-Appellant,

v.

NEW MEXICO COAL 401(K)
PERSONAL SAVINGS PLAN and
USA RETIREMENT SAVINGS
PLAN; THE BHP BASIC LIFE
INSURANCE PLAN,

      Defendants-Appellees.

No. 08-2213
(D.C. No. 2:07-CV-00736-RB-LFG)
(D. N.M.)

---

**ORDER AND JUDGMENT**[*]

---

Before **BRISCOE**, **BALDOCK**, and **HOLMES**, Circuit Judges.

---

      Plaintiff-Appellant LiliRae Smith sued Defendants-Appellees New Mexico

Coal 401(k) Personal Savings Plan ("Personal Savings Plan") and USA

Retirement Savings Plan ("Retirement Savings Plan") (collectively "Plans"),

---

[*]     After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

under 29 U.S.C. § 1132(a)(1)(B) of the Employee Retirement Income Security Act ("ERISA") for benefits she claims were wrongly paid to her husband's children instead of her as his surviving spouse.[1] She appeals the district court's order denying her motion for summary judgment and granting the Plans' motions to affirm the administrative decisions on the record.[2] We have jurisdiction under 28 U.S.C. § 1291, and we REVERSE and REMAND.

## *Background*

Mr. Begay began working for a mining subsidiary of BHP Billiton ("BHP") in 1976. During his employment, he enrolled in several benefit plans, including the Retirement Savings Plan and the Personal Savings Plan. On November 2, 2004, when he was still actively employed, he was killed in an automobile accident. In a group insurance form executed in October 1978, he designated his beneficiaries as "Suzie Begay, Wife, if surviving, otherwise to Leonard Begay, Jr., Son, and JoHannah Begay, Daughter, share and share alike, if both survive,

---

[1]     Ms. Smith also sued the BHP Basic Life Insurance Plan but voluntarily dismissed that claim.

[2]     We construe the motions as ones for summary judgment. Nonetheless, we reiterate that "[t]he Federal Rules of Civil Procedure contemplate no such mechanism as judgment on the administrative record. Parties should avoid the practice of requesting it, and courts should avoid purporting to grant it. Doing so often creates unnecessary work for an appellate court in deciding whether to construe such a motion *ex post* as one for a bench trial . . . or as one for summary judgment[.]" *Jewell v. Life Ins. Co. of N. Am.*, 508 F.3d 1303, 1307 n.1 (10th Cir. 2007), *cert. denied*, 128 S. Ct. 2872 (2008) (internal quotation marks and citations omitted).

otherwise to the survivor[.]" Aplt. App., Vol. II at 356. A group insurance form executed in March 1979, was for all intents and purposes identical to the 1978 form. From this point forward, however, Mr. Begay never again referred to Suzie Begay in any capacity, and instead indicated he was divorced. For example, in a group insurance form executed in October 1989, he named his beneficiaries as "Leonard C. Begay, Jr., Johannah Begay, Johansen Begay and Elnathan Begay, share and share alike if surviving[,] otherwise to survivors, share and share alike or to the survivor." *Id*. at 352. In 1991, he filled out a personal data information form in which he indicated he was divorced.

Mr. Begay enrolled in the Retirement Savings Plan in May 1997, and in the Personal Savings Plan in November 1998. In March 2002, Mr. Begay executed an enrollment change form for his medical insurance and also made changes as to the beneficiaries for his life and accidental death insurance. He requested medical coverage for only himself and then 19-year-old son, Elnathan, and changed his life and accidental death beneficiaries to eliminate his son, Johansen, who had recently died. He renamed his surviving children as beneficiaries, with Leonard, Jr. and Johannah (both adults) receiving 20% each, and Elnathan receiving 60%.

A few months later, in October 2002, Mr. Begay executed a beneficiary designation for his Personal Savings Plan in which he certified that he was not married and named his beneficiaries and their percentages as: Elnathan, 60%,

Johannah, 20%, and Leonard, Jr. 20%. The Plans allege that at or near the same time, he also executed a beneficiary designation for his Retirement Savings Plan, which reflected the same designations as the Personal Savings Plan; however, this form has never been produced. What does appear in the record is a quarterly statement from Vanguard (the Retirement Plan trustee) sent to Mr. Begay at his home in New Mexico for April 1, 2004 – June 30, 2004, which states there is "No Beneficiary On File[.] *The Beneficiary(ies) listed here reflect the information currently on file at Vanguard. If you wish to update your beneficiary information, please contact Vanguard's Participant Services Department at 1-800-523-1188."* *Id*. at 494. The statement prepared *after* Mr. Begay died, covering the quarter from October 1, 2004 – December 31, 2004, was addressed to him at Johannah's address in Colorado, and restates that there is "No Beneficiary On File[.]" *Id*. at 522. Below this notation, Johannah, Elnathan, and Leonard, Jr.'s names are listed with allocations of "0.00%." *Id*.

The day following their father's death, Leonard, Jr., Johannah, and Elnathan submitted life and accidental death insurance claims in which they noted their father was divorced. A December 6, 2004, death certificate also indicated that he was divorced. In the meantime, the Plans began the task of sorting through Mr. Begay's benefit plans. A November 11, 2004, email from Renae Duncan, a retirement plan specialist, to Roe Arn, a human resources supervisor, noted that Mr. Begay did not have a beneficiary designation on file for his

Retirement Income Plan ("Income Plan"). She asked for Ms. Arn's help in clearing up his marital status, because her records indicated that he was still married, but other records indicated he was divorced. The record contains no response from Ms. Arn until Ms. Duncan emailed her again on January 21, 2005, telling her that Johannah telephoned about the pension plan. Ms. Arn responded the same day with a copy of Mr. Begay's death certificate and also told her that "[t]he only beneficiary form we had on file for him was for the Life Insurance." *Id*. at 379. On January 26, 2005, Ms. Duncan emailed Ms. Arn the following:

> We have everything in motion for Mr. Begay's beneficiaries for the Personal Savings Plan. *The other plans in which Mr. Begay was a participant had no beneficiary designations*, so his daughter JoHannah Billsie will be our contact person for the estate. In addition to the loss of their father, Leonard C. Begay, Jr. passed away recently, so his portion of the benefit from the Personal Savings Plan will go to his estate.
> The one last thing I needed from you was Mr. Begay's employment history so that I can complete the salary calculation for the Retirement Income Plan.

*Id*. at 378 (emphasis added).

In January 2005, proceeds from Mr. Begay's life and accidental death policies were paid to Johannah and Elnathan, and Leonard, Jr.'s estate received its share in July and August, 2005, following the appointment of a personal representative. As to Mr. Begay's other benefit plans, Ms. Arn wrote a letter dated March 14, 2005, addressed "To Whom It May Concern," *id*. at 389, stating: "This letter is in regards to the beneficiaries of Leonard C. Begay's benefit plans.

At this time the Pension Benefits group in our Houston office is working on identifying the beneficiaries per the rules for each of Mr. Begay's plans. No information is currently available to be released." *Id*.

On March 21, 2005, Ms. Smith and Johannah filed a "Stipulation For Validation Of Marriage" ("Stipulation") in the Navajo Nation Family Court. *Id*. at 505-07. Ms. Smith originally filed the petition to have her marriage validated on December 27, 2004, about seven weeks following Mr. Begay's death. Apparently, Johannah initially opposed the action, but changed her mind as of March 21, and agreed that her father divorced Suzie Begay in 1993, and that "the union of LiliRae Smith and Leonard C. Begay, Sr. met the general requirements for marriage, and the specific requirements for common-law marriage under N.N.C., Title 9." *Id*. at 506. Together, Johannah and Ms. Smith asked the court to validate the marriage retroactive to September 1, 2000.[3]

Several days later, on March 24, 2005, Ms. Smith personally visited BHP's office to hand-deliver a copy of the Stipulation to Ms. Arn. Despite receipt of the Stipulation, Johannah obtained 20% of the Retirement Savings Plan on April 1, 2005, and Elnathan obtained 60% on June 16, 2005. On September 15, 2005,

---

[3] New Mexico itself does not recognize common-law marriages, but does recognize them if they are valid in another jurisdiction. N.M. Stat. Ann. § 40-1-10. Thus, New Mexico would recognize Ms. Smith's and Mr. Begay's marriage if it were deemed valid under Navajo law. *See In re Bivians' Estate*, 652 P.2d 744, 748 (N.M. App. 1982) (holding that "[a]lthough this state does not authorize common law marriages, it will recognize such marriages if valid in the jurisdiction where consummated.").

Ms. Smith's lawyer formally notified BHP of her potential interest in Mr. Begay's estate, provided an update on the proceedings to validate the marriage, and notified the company that "[n]o pension funds or other employment benefits of Leonard C. Begay, Sr. should be distributed until the matter is fully resolved." *Id*. at 392. Apparently still unconcerned about Mr. Begay's marital status, the Plans made the following additional distribution of funds: (1) 20% from the Personal Savings Plan to Johannah on January 17, 2006; (2) 20% from the Personal Savings Plan and Retirement Savings Plan to Leonard, Jr.'s estate on January 23, 2006; and (3) 60% from the Personal Savings Plan to Elnathan on June 29, 2006.

Ms. Smith's marriage to Mr. Begay was validated in an August 7, 2006, order that "declared [them] to be husband and wife from August 22, 1998, to the date of [his] death on November 2, 2004." *Id*. at 406. A copy of the order was provided to Ms. Arn on August 16, at which time Ms. Smith's attorney also asked for "information on any funds that have been disbursed to date, including the type of account, amounts disbursed and the recipients of the funds." *Id*. at 405.

When Ms. Arn failed to respond, Ms. Smith's lawyer wrote again on October 4, 2006, repeating his previous request and enclosing an order appointing Ms. Smith as the personal representative of Mr. Begay's estate in probate proceedings commenced in the Navajo Nation Family Court. On the basis of the order validating the marriage, the Plans recognized Ms. Smith as Mr. Begay's

surviving spouse for purposes of his Income Plan and Navajo Retirement Plan.[4]

However, Ms. Arn refused to answer questions regarding the funds that had already been disbursed, prompting the lawyer to write again on October 23, 2006. This request also was met with silence. On November 16, 2006, the lawyer wrote a lengthy letter inquiring specifically about, among other things, the Retirement Savings Plan and Personal Savings Plan.

A written explanation was eventually provided on December 4, 2006. As to the Retirement Savings Plan, Ms. Arm stated it "was paid out per a beneficiary designation completed by Mr. Begay." *Id*. at 458. The "designation" relied upon was Vanguard's *quarterly statement prepared after Mr. Begay died*: "The statement shows that the beneficiaries were the same as in the Personal Savings Plan . . . but due to a file overlay problem connected to the transition of the plan to Vanguard, does not show the percentages going to each beneficiary." *Id*. In the same breath, she admitted that "Vanguard has been unable to find the scanned version of the original beneficiary designation form," *id.,* and speculated it might have been "purged" because "the benefit had been paid out quite some time ago." *Id*. She stated that the Personal Savings Plan was distributed according to the

---

[4]     BHP also discovered that Mr. Begay also had an interest in the Stock Investment Plan, and finding no beneficiary designation, disbursed those funds to Ms. Smith as the surviving spouse.

beneficiary designation and produced a copy of the designation. Ms. Arn further

explained why she attached no importance to the Stipulation:

> 1. The administrator of a retirement plan may rely on the affirmation of an employee of marital status. Absent conflicting information or knowledge to the contrary, the administrator has no obligation to ascertain whether or not an employee is married, single or divorced when he has asserted any given status. The administrator has no obligation to ascertain whether or not the assertion of marital status is false or fraudulent.
>
> 2. Mr. Begay executed a beneficiary designation in 2002 in which he represented and certified he was not married.
>
> 3. Mr. Begay's death certificate indicated he was divorced.
>
> 4. Mr. Begay did not provide spousal coverage under his medical and dental insurance offered through his employer.
>
> 5. Mr. Begay's common law spouse did not contact the plan administrator upon his death concerning any benefits she might be entitled to receive.
>
> 6. If conflicting claims for a deceased employee's benefits arise, it would be BHP Billiton's procedure to resolve the issue with reference to the applicable plan documents, any beneficiary designations executed by the employee and other evidence that would allow us to determine the proper disposition of any proceeds from employment related benefit programs. If it is not possible to make the determination based on the facts, circumstances and documents listed above, BHP Billiton would request assistance from the appropriate court system to make that determination which would generally be the federal courts due to the ERISA pre-emption.

*Id*. at 458-59.

Ms. Smith's lawyer responded on December 12, 2006, to explain his version of the facts. With regard to the Retirement Savings Plan, he noted the conflict between the quarterly statements *before and after* Mr. Begay's death:

> We have in our file, a statement of June 30, 2004 showing a balance of $348,976.17 and further reflecting that there is no beneficiary on file. . . . You have provided us a statement dated after Mr. Begay's death which shows a balance of $370,364.84. The statement you provided also shows no beneficiary on file and it lists three of Mr. Begay's children as having a 0% interest. Also, this statement lists an address for Mr. Begay in Fountain, Colorado. Mr. Begay did not live in Fountain, Colorado. It appears to me that incorrect information may have been provided after Mr. Begay's death by his daughter, Johannah Billsie who, at the time, did reside in Fountain, Colorado. . . . [It appears] the funds in this account are the assets of Mr. Begay's estate, and to the extent the funds were distributed erroneously, the funds will have to be restored.

*Id*. at 490.

As to the Personal Savings Plan, Ms. Smith's lawyer acknowledged the designation of beneficiary executed by Mr. Begay in 2002. He claimed, however, that prior to the distribution of any funds from either Plan, the administrator was on notice that "Mr. Begay's marital status was in question and the matter was pending in the courts." *Id*. at 492.

> [O]n March 24, 2005, LiliRae Smith and Leonard Begay's sister, Fannie Lookingglass, went to see you [Ms. Arn] at the La Plata Mine twice on that date. When they asked for you, your assistant, who they believed was named Sharon, spoke with them. They provided Sharon with copies of the Stipulation of Marriage Validation filed March 21, 2005 in the Family Court of the Navajo Nation and the Order for Appointment of Personal Representative[.] . . . They gave Sharon copies of these two documents and Sharon took them out of the room (presumably to

-10-

make copies) and then returned with the documents stating that she would speak to you and get back to them.  Ms. Smith and Ms. Lookingglass returned in the afternoon and Sharon stated that she had spoken to you and that the company's attorney would need to be consulted before any information could be released.  Ms. Lookingglass immediately called our office to report these conversations[.]

It appears to me, therefore, that your company had actual notice and knowledge of the validation of marriage proceedings no later [than] March 24, 2005.  It would seem to me that any distributions of funds belonging to the probate estate made on or after March 24, 2005 will have to be restored to the estate.

*Id*. at 490-91.  He also questioned Ms. Arn's reliance on the death certificate, the lack of medical coverage for Ms. Smith, and the alleged failure to immediately contact the administrator as reasonable grounds on which to pay Mr. Begay's children:

With respect to Mr. Begay's death certificate, we would have no way of knowing where that information came from.  Again, where there is evidence to the contrary, I don't believe it is appropriate for BHP to rely on a document of that type.

Similarly, the fact that Mr. Begay did not provide spousal coverage under his medical and dental plan would seem irrelevant. . . .  In many instances, as you surely know, spouses can have medical and dental coverage under their own employer's policies.

You state that Mr. Begay's wife did not contact the plan's administrator upon his death.  But in fact, she did contact the plan administrator on March 24, 2005.  Similarly, I placed the mine on notice on September 15, 2005.  The notices provided by Ms. Smith and by this office were apparently disregarded.

*Id*. at 491.

It was not until April 27, 2007, that Ms. Arn responded, repeating her previous reasoning and faulting Ms. Smith for not immediately notifying the administrator upon Mr. Begay's death concerning her claim as a spouse. According to Ms. Arn,

> [b]ased on her actions to have her status adjudicated as a spouse in early 2005 she appeared to have realized or should have known that there was a controversy as to her legal status. Despite this she made no attempt to notify BHP until almost 5 months from the date of Mr. Begay's death. By that time, payments had begun the prior month (4 months from the date of Mr. Begay's death) to the named beneficiaries on file with BHP. These payments were made as part of a routine process of distribution to non-spouse beneficiaries and should be viewed in the context of what was actually known to BHP at that time. Implied knowledge of a controversy surrounding your client's attempt to be named as Mr. Begay's spouse cannot be imputed to BHP in February 2005.[5]
>
> .... At this point, the aforementioned Plan monies have been properly paid out in BHP Billiton's view and the matter is resolved as a matter of benefits administration.

*Id*. at 578.

---

5    In reference to Ms. Arn's statement that "[i]mplied knowledge of a controversy surrounding [Ms. Smith's] attempt to be named as Mr. Begay's spouse cannot be imputed to [the Plans] in February 2005," Aplt. App., Vol. II at 578, the Plans argued in the district court that "[i]n February 2005, Begay's . . . Retirement Savings Plan account was converted to a 'deceased participant' account, with sub-accounts in the name of the Begay children." Aplee. Supp. App. at 4. On appeal, they are somewhat less dogmatic about when the sub-accounts were established, claiming only that "[b]etween December 31, 2004 (the last RSP statement) and April 1, 2005 (the first RSP disbursal), Vanguard transferred Begay's RSP fund to sub-accounts for Elnathan, JoHannah, and Leonard, Jr.'s estate." Aplee. Br. at 9.

Ms. Smith filed suit in district court. The court denied her motion for summary judgment and granted the Plans' motions to affirm the administrator's decisions to pay Mr. Begay's children the proceeds from his Retirement Savings Plan and Personal Savings Plan. The court applied a deferential arbitrary and capricious standard of review. It assumed, however, that the Plans had a conflict of interest and, consequently, it granted less deference under this standard to the Plans' determinations. Even under this more rigorous examination, the court nonetheless concluded that the decision to pay the funds to Mr. Begay's children "was reasonable and supported by substantial evidence." *Id.*, Vol. III at 746. In particular, the court found that until the marriage was actually validated on August 7, 2006, "it was both logical and reasonable for [the Plans] to determine that there was insufficient evidence that [Ms. Smith] was Mr. Begay's spouse." *Id.* at 749. This appeal followed.

### *Discussion*

"We review summary judgment orders de novo. We accord no deference to the district court's decision." *Weber v. GE Group Life Assurance Co.*, 541 F.3d 1002, 1010 (10th Cir. 2008) (citations omitted). "Like the district court, we must first determine the appropriate standard to be applied to [the Plans'] decision to deny benefits." *Id.* Where a plan administrator lacks discretionary authority to determine eligibility for benefits or construe the terms of the plan, we review the administrator's decision de novo. *Jewell v. Life Ins. Co. of N. Am.*, 508 F.3d 1303,

-13-

1308 (10th Cir. 2007), *cert. denied*, 128 S. Ct. 2872 (2008). "De novo review means that we make an independent determination of the issues." *Heggy v. Heggy*, 944 F.2d 1537, 1539 (10th Cir. 1991). However, where the plan gives an administrator discretionary authority to determine eligibility for benefits or to construe its terms, "we employ a deferential standard of review, asking only whether the denial of benefits was arbitrary and capricious[.]" *Weber*, 541 F.3d at 1010 (internal quotation marks and citation omitted). Under this standard, which is sometimes called the "pure" arbitrary and capricious standard, *Gaither v. Aetna Life Ins. Co.*, 394 F.3d 792, 801 (10th Cir. 2004), "we curtail our review, asking only whether the interpretation of the plan was reasonable and made in good faith." *Weber*, 541 F.3d at 1010 (internal quotation marks omitted).

However, this is not the end of our inquiry because where an administrator operates under a conflict of interest or there are serious procedural irregularities, *Fought v. Unum Life Ins. Co. of Am.*, 379 F.3d 997, 1006-07 (10th Cir. 2004), "we dial back our deference[.]" *Weber*, 541 F.3d at 1010. In other words, although we "will always apply an arbitrary and capricious standard, [we] decrease the level of deference given in proportion to the seriousness of the conflict [or irregularity]." *Id.* (internal quotation marks and ellipsis omitted).

The Plans provide:

[] <u>EFFECT OF DEATH</u>.

-14-

[] <u>Death</u>.  If a Participant dies before the receipt of the Participant's Accounts, the Participant's Beneficiary shall be entitled to receive such Accounts.  Payment shall be made in a single sum as soon as practicable following the Participant's death or the Beneficiary's request. . . .

[] <u>Beneficiary</u>.  Ordinarily, a Participant's Beneficiary shall be the person or persons so designated by the Participant.  However, . . . any designation by a married Participant of a person other than the Participant's spouse as Beneficiary shall be effective only if his or her spouse consents to such a designation.  The spouse's consent shall be in writing, shall acknowledge the effect of such a designation and shall be witnessed by a notary public.  Subject to the foregoing, a participant may designate or change such Participant's Beneficiary at any time.  To be effective, any such designation or change must be in writing on the prescribed form and must be received by BHP or its agent before the Participant's death.  If any Participant fails to designate a Beneficiary or if the Participant's designated Beneficiary (including any contingent Beneficiary) is not living at the time the distribution of the Participant's Accounts is to be made, the Beneficiary shall be the Participant's spouse or, if there is no spouse then living, the Participant's estate. . . .[6]

[] <u>ADMINISTRATION OF THE PLAN</u>.

[] <u>Administrative Responsibilities</u>.  BHP is the named fiduciary which has the authority to control and manage the operation and administration of the Plan.  BHP shall make such rules, regulations and computations and shall take such other actions to administer the Plan as BHP may deem appropriate.  BHP shall have sole discretion to interpret the terms of the Plan and to determine eligibility for benefits pursuant to the objective criteria set forth in the Plan.

Aplt. App., Vol. I at 12, *see also id.* at 87-88.

---

[6]    Because Leonard, Jr. was not living at the time the distributions were made, his shares should apparently have been paid to Mr. Begay's living spouse, or if none, Mr. Begay's estate.

We need not definitively determine here the appropriate standard of review for evaluating the Plans' decisions. That is because we conclude that the decision to distribute funds from the Retirement Savings Plan and Personal Savings Plan after March 24, 2005, to Mr. Begay's children cannot withstand scrutiny under the most forgiving analysis possible, i.e., the "pure" arbitrary and capricious standard of review.

"[I]n reviewing a plan administrator's decision under the arbitrary and capricious standard, [we] are limited to the administrative record – the materials complied by the administrator in the course of making his decision." *Weber,* 541 F.3d at 1011 (internal quotation marks omitted). Also, "we consider only the rationale asserted by the plan administrator in the administrative record and determine whether the decision, based on the asserted rationale, was arbitrary and capricious." *Id.* (internal punctuation and quotation marks omitted). "[T]he Administrator's decision need not be the only logical one nor even the best one. It need only be sufficiently supported by facts within [his] knowledge to counter a claim that it was arbitrary or capricious." *Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1098 (10th Cir. 1999) (internal quotation marks omitted). "A lack of substantial evidence often indicates an arbitrary and capricious decision. . . . Substantial evidence is of the sort that a reasonable mind could accept as sufficient to support a conclusion. . . . Substantial evidence means more than a scintilla, of course, yet less than a preponderance." *Adamson v. Unum Life Ins. Co. of Am.*, 455 F.3d 1209,

1212 (10th Cir. 2006) (internal citations omitted). Nor can "fiduciaries . . . shut their eyes to readily available information when the evidence in the record suggests that the information might confirm the beneficiary's theory of entitlement and when they have little or no evidence in the record to refute that theory." *Gaither,* 394 F.3d at 807.

We turn to Ms. Arn's letters to determine whether the decision to pay Mr. Begay's children was reasonable. The first reason given was that an "administrator of a retirement plan may rely on the affirmation of an employee of marital status. *Absent conflicting information* or knowledge to the contrary, the administrator has no obligation to ascertain whether or not an employee is married." Aplt. App., Vol. II at 577 (emphasis added). The Plans did not follow their own procedure. Once Ms. Arn received the Stipulation, which constituted "conflicting information," it was incumbent on her to "ascertain whether or not [Mr. Begay was] married." *Id.* The only way to "ascertain" this fact was to wait for the outcome of the legal proceedings.

The second, third, fourth, and fifth reasons also are without merit. Ms. Arn pointed to the fact that "Mr. Begay executed a beneficiary designation in 2002 in which he represented and certified he was not married," *id.*, and there "was no beneficiary designation form on file with BHP executed by Mr. Begay that was later in time from the form executed in 2002." *Id.* This appears to be true; however, it has nothing to do with whether there was "conflicting information"

-17-

regarding his marital status. For the same reason, the rationale that "Mr. Begay's death certificate indicated he was divorced," *id*., also fails. This rationale ignores the obvious conflict between the certificate and the Stipulation. We likewise reject the fact that Ms. Smith was not covered under Mr. Begay's medical insurance as a reasonable ground on which to determine that she was not his spouse. No information concerning his marital status was asked, and none can reasonably be inferred from the fact that he did not elect such coverage.

We agree that prior to March 24, 2005, there existed no conflicting information as to whether Mr. Begay had a spouse, but a conflict arose when Ms. Arn learned that Ms. Smith was involved in proceedings to validate her marriage. On March 24, Ms. Smith attempted to personally deliver a copy of the Stipulation to Ms. Arn. An assistant told Ms. Smith that she would speak to Ms. Arn and get back to her. We operate on the premise that Ms. Arn received a copy of the Stipulation. When Ms. Smith returned later that day, the assistant told her that she had spoken to Ms. Arn and the "company's attorney would need to be consulted[.]" *Id.* at 491. And the Plans never disputed this version of the facts. *Id.* at 577-78. More to the point, there is no evidence that Ms. Arn ever followed up with Ms. Smith or anyone else after March 24 – when the "conflict" arose – to ascertain the facts.

Having determined that as of March 24, 2005, it was unreasonable for the administrator to have disbursed any funds from the Plans to Mr. Begay's children,

we next address the timing issue. The administrator found fault with Ms. Smith for failing to "contact the plan administrator immediately upon [Mr. Begay's] death concerning any benefits she might be entitled to receive," *id*. at 578, and stated that "[i]f *conflicting claims* . . . had arisen on a timely basis," *id*. (emphasis added), the outcome might have been different. Setting aside the apparent admission that the Stipulation was sufficient to create a conflict, the argument that it came too late lacks record support. First, there is no deadline for filing a claim; instead, the administrator is responsible for identifying and paying the beneficiaries "*as soon as practicable* following the Participant's death or the Beneficiary's request." *Id*., Vol. I, at 12, 87-88 (emphasis added). Second, the suggestion that there was pressure to disburse the money also is without merit. There were no requests for payment with respect to the plans at issue from any of Mr. Begay's children, and as of March 14, 2005, "the Pension Benefits group . . . [was] working on identifying the beneficiaries per the rules for each of Mr. Begay's plans." *Id*., Vol. II at 389.

Although Ms. Arn did not say so directly, she represented that Mr. Begay's children had already been paid: "Implied knowledge of a controversy surrounding your client's attempt to be named as Mr. Begay's spouse cannot be imputed to [the Plans] in February 2005." *Id*. at 578. The record tells a different story. The funds from the Personal Savings Plan were disbursed well after March 24, 2005, and all of these funds must be restored and made available to Ms. Smith according to the terms of the Plan. As to the Retirement Savings Plan, the Plans assert that prior to

March 24, they set up sub-accounts for Mr. Begay's children, and having created these accounts, they could not recover the money.[7] Assuming for argument's sake that the Plans could do nothing to regain the money, their contention that the sub-accounts were established prior to March 24 lacks record support. The only evidence concerning these accounts is when the checks were drawn and paid. *Id*. at 541-43. We cannot explain why the Plans failed to provide this critical evidence, but having no actual proof that these funds were beyond their control prior to March 24, they must likewise be restored and made available to Ms. Smith pursuant to the Plan's terms.

The decision of the district court is REVERSED and the case is REMANDED for the entry of summary judgment in favor of Ms. Smith and against the Plans consistent with this ORDER and JUDGMENT.

Entered for the Court

Jerome A. Holmes
Circuit Judge

---

[7] Given our resolution of the case, we need not decide whether the Plans had sufficient evidence to determine that Mr. Begay had designated any beneficiaries for his Retirement Savings Plan.