Paul J. FROMMERT, et al., Plaintiffs,

v.

Sally L. CONKRIGHT, Xerox Corporation Pension Plan Administrator, et al., Defendants.

No. 00–CV–6311L.

United States District Court,
W.D. New York.

Nov. 17, 2011.

George A. Schell, Jr., Schell & Schell, Fairport, NY, Peter K. Stris, Stris & Maher LLP, Gardena, CA, Robert H. Jaffe, Robert H. Jaffe & Associates, P.A., Springfield, NJ, Amber M. Ziegler, John A. Strain, Law Offices of John A. Strain, Manhattan Beach, CA, Matthew J. Fusco, Chamberlain, D'Amanda, Oppenheimer & Greenfield, LLP, Rochester, NY, for Plaintiffs.

Margaret A. Clemens, Littler Mendelson, P.C., Rochester, NY, Robert A. Long, Jr., Robert D. Wick, Covington & Burling LLP, Washington, DC, for Defendants.

### *DECISION AND ORDER*

DAVID G. LARIMER, District Judge.

### INTRODUCTION

This case presents claims under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1101 *et seq.*, by current and former employees of Xerox Corporation ("Xerox"), relating to their pension benefits. The plaintiffs in this action have all been employed by Xerox at various times, and they have all participated in the Xerox Retirement Income Guarantee Plan ("RIGP" or "Plan"). All the plaintiffs left Xerox's employ at some point, at which time they each received a lump-sum distribution of accrued pension benefits, and they later returned to work for Xerox. The basic issue in this case involves how to take those past distributions into account when calculating plaintiffs' current or future benefits, so that plaintiffs are neither shortchanged nor given a windfall.

Besides the instant case, five other related lawsuits are currently pending before the Court, involving similar claims and issues.[1] Various issues and motions are awaiting decision by the Court in all of these actions. This Decision and Order directly deals only with the *Frommert* action, although my rulings here may effectively dispose of, or at least have some bearing on, some of the issues in those other cases.

This action, *Frommert*, is now before the Court on remand from the Court of Appeals for the Second Circuit. That remand followed the United States Supreme Court's remand of this action to the Court of Appeals. Some background is necessary to understand the terms of those remands.

In 2007 this Court, on remand from the Court of Appeals from an earlier decision in this case, crafted a remedy to address ERISA violations that had been identified by the Second Circuit in a prior appeal. In doing so, I applied a *de novo* standard in interpreting the Plan, and I did not accept the Plan Administrator's proposed interpretation of the Plan, the substance of which will be discussed in more detail below. *See* 472 F.Supp.2d 452, 456–59. I also ruled that the written releases signed by some of the plaintiffs were unenforceable as to the ERISA claims at issue in this case. *Id.* at 461–62.

On appeal, the Second Circuit upheld my decision not to apply a deferential standard to the Administrator's interpretation, and affirmed as to the remedy portion of my decision. The court also vacated and remanded as to the issue concerning the releases, however, finding that the releases were enforceable. 535 F.3d 111, 120–22 (2d Cir.2008).

Defendants then successfully sought a writ of certiorari from the Supreme Court, a majority of which held that "[t]he Court of Appeals erred in holding that the District Court could refuse to defer to the Plan Administrator's interpretation of the Plan on remand, simply because the Court of Appeals had found a previous related interpretation by the Administrator to be invalid." *Conkright v. Frommert*, 559 U.S. ——, 130 S.Ct. 1640, 1651, 176 L.Ed.2d 469 (2010). The Supreme Court remanded the case to the Second Circuit, which in turn remanded to this Court for further proceedings. *See* Dkt. # 203. The Supreme Court did not address the Court of Appeals' holding concerning the enforceability of the release forms signed by some of the plaintiffs.

Following the Supreme Court's and Court of Appeals' remands, the *Frommert* plaintiffs filed a motion to reenter judgment (Dkt. # 204, # 205), and defendants filed a cross-motion (Dkt. # 211) for an order affirming the Plan Administrator's interpretation of the Plan, authorizing the Plan Administrator to calculate and pay benefits in accordance with that interpretation, and dismissing the complaint. On June 2, 2011, the Court met with counsel for all the parties in *Frommert* and the five other related cases, to discuss the various pending motions and how best to proceed. The following constitutes the Court's decision on the pending motions in *Frommert*. Written decisions on the pending motions in the other cases will be issued separately.

## DISCUSSION

### I. Procedural History

The *Frommert* action was the first of these cases to be filed, in June 2000. The

---

1. Those cases are: *Anderson v. Xerox,* 06–6202; *Kunsman v. Conkright,* 08–CV–6080; *Holland v. Becker,* 08–CV–6171; *Testa v. Beck-* er, 10–CV–6229; and *Clouthier v. Becker,* 08–CV–6441.

factual background and history of the *Frommert* litigation (which were aptly described by the Supreme Court as "exceedingly complicated," *see Conkright*, 559 U.S. at ——, 130 S.Ct. at 1644), have been fully set forth in a number of decisions by this Court, by the Court of Appeals for the Second Circuit, and by the Supreme Court, familiarity with all of which is assumed.[2]

In general, the *Frommert* plaintiffs are all current or former employees of Xerox, each of whom worked for Xerox during two separate periods. During the original period of employment, each plaintiff was a participant in the RIGP. Upon the initial termination of employment, each plaintiff received a lump-sum distribution of his pension benefit. Each plaintiff was later rehired by Xerox and again became a participant in the RIGP.

"In order to avoid paying duplicative benefits to rehired employees who had previously received a lump sum distribution, the Plan has always contained provisions concerning the offset of prior distributions." *Frommert v. Conkright* ("*Frommert I*"), 433 F.3d 254, 257 (2d Cir.2006).[3] What is at issue here is the manner in which that offset has been calculated and applied, and whether plaintiffs were adequately notified in advance of that offset.

Again, the details of the offset, as it has been applied and made known to participants over the years, have been set forth elsewhere, *see, e.g., id.* at 257–61, but in short, the methodology by which the Administrator originally calculated plaintiffs' benefits involved the use of a so-called "phantom account." Under the phantom-account formula, the Plan Administrator would calculate the hypothetical growth that the employees' past distributions would have experienced if the previously-distributed money had remained in Xerox's investment funds, and the Administrator would then reduce the employee's present benefits accordingly.

In 2004, this Court granted summary judgment for the Plan, applying a deferential standard of review to the Plan Administrator's interpretation. *See* 328 F.Supp.2d 420, 430–431. On appeal, the Second Circuit in *Frommert I* found, "as a matter of law, that the phantom account was not part of the Plan until 1998 when it was added by amendment of the Plan's text through its explanation in the 1998 SPD [summary plan description]." 433 F.3d at 263. Therefore, the court stated, "the phantom account may not be applied to employees rehired prior to the issuance of the 1998 SPD," although it could be applied to employees rehired after that date, because the phantom account was adequately disclosed by the 1998 SPD to such employees when they joined the plan. *Id.* That holding was not affected by the Supreme Court's decision in this case, and the Administrator does not now contend that the phantom account should be utilized in calculating the benefits owed to any of the plaintiffs, other than those who have signed written release forms.

On remand to this Court from the Court of Appeals, the Administrator proposed a new interpretation of the Plan. That interpretation did not use the phantom-account formula, but it did take prior distributions into account, by expressing the participant's prior distribution as an annuity commencing at normal retirement age. *See* Dkt. # 121–2 ¶ 7. The Administrator

---

**2.** *See, e.g.,* 535 F.3d at 115–16, 433 F.3d 254, 257–62 (2d Cir.2006); 328 F.Supp.2d 420, 423–29 (W.D.N.Y.2004).

**3.** For the reader's convenience, the names "*Frommert I*" and "*Frommert II*" will be used here to distinguish between the Court of Appeals' 2006 and 2008 decisions in this case.

explained that this approach would offset the participant's accrued benefit by the "actuarial equivalent" of the prior lump-sum distribution. *Id.* ¶ 11.

This Court, however, did not give any deference to that proposed interpretation. Instead, applying a *de novo* standard, the Court adopted an approach under which plaintiffs' present benefits were reduced only by the nominal, non-appreciated amount of their past distributions. *See* 472 F.Supp.2d at 457–458.

On appeal from that decision, the Second Circuit affirmed in relevant part, holding in *Frommert II* that this Court was correct not to apply a deferential standard on remand, and that my decision on the merits, concerning the proper remedy, was not an abuse of discretion. *See Frommert II,* 535 F.3d at 119. The court stated that there was no authority that a court must "afford deference to the mere *opinion* of the plan administrator in a case, such as this, where the administrator had previously construed the same terms and we found such a construction to have violated ERISA." *Id.*

The Supreme Court, however, disagreed. It held that both this Court and the Court of Appeals erred with respect to the standard of review to be applied to the Administrator's new proposed interpretation of the Plan. By a 5–4 majority, the Supreme Court held that this Court should give deference to the Plan Administrator's interpretation of the Plan with respect to the treatment of prior distributions to employees who were rehired prior to the issuance of the 1998 SPD. The Court did not hold that the Administrator should necessarily prevail on the merits, but only that this Court should apply the standard of review established in *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), and *Metropolitan Life Ins. Co. v. Glenn,* 554 U.S. 105, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008).

The Supreme Court therefore remanded the case to the Court of Appeals for further proceedings. The latter court in turn remanded to this Court, without comment. Dkt. # 203.

What must now be decided by this Court, then, is how to apply the Supreme Court's holding: in other words, the Court must decide how to interpret the Plan, giving due deference to the Plan Administrator's proposed interpretation. In addition, the Court must implement the Second Circuit's holding concerning the releases signed by some of the plaintiffs, which was not affected by the Supreme Court's decision.

## II. Plan Interpretation: General Principles

Under the "highly deferential" *Firestone* standard, *see Celardo v. GNY Automobile Dealers Health & Welfare Trust,* 318 F.3d 142, 146 (2d Cir.2003), "[t]he Court may not upset a reasonable interpretation by the administrator." *Jordan v. Retirement Comm. of Rensselaer Polytechnic Inst.,* 46 F.3d 1264, 1271 (2d Cir.1995). *See also Conkright,* 559 U.S. at ——, 130 S.Ct. at 1646 (stating that *Firestone* established a "broad standard of deference without any suggestion that the standard was susceptible to ad hoc exceptions"); *Miles v. New York State Teamsters Conference Pension & Ret. Fund Employee Pension Benefit Plan,* 698 F.2d 593, 601 (2d Cir.1983) ("Where both the trustees of [an ERISA plan] and a rejected applicant offer rational, though conflicting, interpretations of plan provisions, the trustees' interpretation must be allowed to control").

When applying this standard, then, the "court may overturn a plan administrator's decision to deny benefits only if the

decision was 'without reason, unsupported by substantial evidence or erroneous as a matter of law.'" *Celardo,* 318 F.3d at 146 (internal quotation marks omitted). *Accord Novella v. Westchester County,* 661 F.3d 128, 139–40 (2d Cir.2011). *See also Manning v. American Republic Ins. Co.,* 604 F.3d 1030, 1038 (8th Cir.) (under arbitrary-and-capricious standard, "[a]ny reasonable decision will stand, even if the court would interpret the language differently as an original matter"), *cert. denied,* —— U.S. ——, 131 S.Ct. 648, 178 L.Ed.2d 480 (2010).

■■■ An administrator's discretion is not unbridled, however. "[E]ven as an ERISA plan confers discretion on its administrator to interpret the plan, the administrator is not free to alter the terms of the plan or to construe unambiguous terms other than as written. Interpretive discretion only allows an administrator to resolve ambiguity." *Colucci v. Agfa Corp. Severance Pay Plan,* 431 F.3d 170, 176 (4th Cir.2005) (citations omitted), *cert. denied,* 547 U.S. 1148, 126 S.Ct. 2300, 164 L.Ed.2d 815 (2006). "Yet when the plan's terms are ambiguous in the sense that its language gives rise to at least two different but reasonable interpretations and when the plan confers discretion on the administrator to interpret the plan and resolve ambiguities, a court defers to the administrator's interpretation by reviewing it only for abuse of discretion." *Id.* (citing *Firestone,* 489 U.S. at 111, 109 S.Ct. 948). "The Court may not substitute its own judgment as to the interpretation of the plan" under this deferential standard. *Shapiro v. Metropolitan Life Ins. Co.,* No. 08–6204, 2010 WL 1779392, at *4 (D.N.J.

Apr. 30, 2010) (citing *Moats v. United Mine Workers of America Health and Retirement Funds,* 981 F.2d 685, 687–88 (3d Cir.1992)), *aff'd,* 430 Fed.Appx. 169 (3d Cir.2011).

Leaving aside for the moment the issue of notice, which will be addressed below, the basic question before the Court, then, is whether the Plan Administrator's current proposed interpretation of the Plan is reasonable. If so, the Court must accept it, regardless of whether a contrary but equally reasonable interpretation could be postulated. *See Bari v. Continental Cas. Co.,* No. 02 CIV. 5628, 2004 WL 1124685, at *10 (S.D.N.Y. May 20, 2004) ("Where it is necessary for a reviewing court to choose between two competing yet reasonable interpretations of a pension plan, this Court must accept that offered by the administrators") (quoting *Pagan v. NYNEX Pension Plan,* 52 F.3d 438, 443 (2d Cir.1995)).

**III. Plan Interpretation in this Case**

■■■ The Plan Administrator, Lawrence Becker, has set forth his proposed interpretation in an affidavit (Dkt. # 211–2).[4] Under that approach, each plaintiff's benefit would be expressed as an annuity beginning at the plaintiff's normal retirement age, *i.e.,* age sixty-five. *See* Dkt. # 133–6 at 10 § 1.26.

Determining an individual participant's benefit under this approach would require several calculations to be performed, to determine and compare the benefits potentially available under the participant's Transitional Retirement Account ("TRA"), Cash Balance Retirement Account

---

**4.** The Administrator's current approach is identical to the one that he advanced following the Court of Appeals' 2008 decision striking down the use of the phantom account for employees rehired prior to 1998. *See* Dkt. # 121–2. Although the Supreme Court did

not address the merits of that interpretation, then, it was that interpretation that the Supreme Court was referring to when it stated that this Court should have applied *Firestone* deference to the Plan Administrator's interpretation of the Plan.

("CBRA"), and highest-average yearly pay ("HAP" or "RIGP formula"). Those formulas have been set forth in prior decisions in this case, *see, e.g., Frommert I*, 433 F.3d at 257, and as stated, familiarity with those decisions is assumed.

Under the Administrator's current approach, both the TRA and the CBRA would be determined without regard to the prior distribution; in other words, the calculation would exclude any amounts associated with the prior distribution. *See* Becker Aff. (Dkt. # 211–2) ¶ 7. The calculation of the HAP or RIGP formula, though, includes an offset of the participant's accrued benefit by the "actuarial equivalent" of the prior distribution. Becker Aff. ¶ 9. In other words, the distribution is expressed as an annual benefit payable at the normal retirement age of sixty-five years. *See Esden v. Bank of Boston*, 229 F.3d 154, 164 (2d Cir.2000). *See also Berger v. Xerox Corp. Retirement Income Guarantee Plan*, 338 F.3d 755, 759 (7th Cir.2003) (discussing actuarial-equivalence methodology generally); *Drutis v. Rand McNally & Co.*, 499 F.3d 608, 613 (6th Cir.2007) ("To derive the 'actuarial equivalent' of a pension at age 65, a plan must (a) add all interest that would accrue through age 65, then (b) discount the resulting sum to its present value") (citing *Berger*, 338 F.3d at 762–63), *cert. denied*, 555 U.S. 816, 129 S.Ct. 68, 172 L.Ed.2d 26 (2008).

Having reviewed the voluminous submissions in this case, I conclude that the Administrator's proposed interpretation of the Plan is reasonable, and, guided by the Supreme Court's admonitions, I accept that interpretation. The Administrator's approach takes into account the time value of money, which the Supreme Court has indicated is proper to do, *see Conkright*, 559 U.S. at ——, 130 S.Ct. at 1650, and it also falls within the scope of the notice that was given to plaintiffs concerning the effect of prior distributions, at least as far back as the 1989 Restatement of the Plan.

As the Ninth Circuit has recognized, "the courts have plainly sanctioned" the "use of benefit offsets in general...." *Miller v. Xerox Corp. Retirement Income Guarantee Plan* ("*Miller I*"), 464 F.3d 871, 876 n. 5 (9th Cir.2006), *cert. denied*, 549 U.S. 1280, 127 S.Ct. 1829, 167 L.Ed.2d 321 (2007). For that matter, plaintiffs here do not dispute that some account should be taken of their prior distributions. And as the Second Circuit has also pointed out, "the Plan has always contained provisions concerning the offset of prior distributions. Without such provisions, rehired employees would receive a windfall upon their second departure from Xerox because they would receive benefits based on their initial tenure at the company on two separate occasions." *Frommert I*, 433 F.3d at 257.

In accounting for such prior distributions, it is reasonable and equitable to take into account the time value of money, *i.e.*, the fact that a sum of money received today, if invested, can appreciate over time. In its decision in this case, the Supreme Court expressly endorsed such an approach, stating that the use of "actuarial principles in accounting for rehired employees' past distributions ... would presumably include taking some cognizance of the time value of money." *Conkright*, 559 U.S. at ——, 130 S.Ct. at 1651. The actuarial-equivalence methodology advocated by the Plan Administrator effectively achieves that result. *See Cooper v. IBM Personal Pension Plan*, 457 F.3d 636, 640 (7th Cir.2006) (under ERISA, "when any beneficiary ... elects to take a cash distribution ... before reaching age 65, the plan must distribute a lump sum calculated to be the 'actuarial equivalent' of the annuity that would be available at normal retirement age," which requires

the plan to "add all interest that would accrue through age 65, then (b) discount the resulting sum to its present value") (citing 29 U.S.C. § 1054(c)(3)), *cert. denied,* 549 U.S. 1175, 127 S.Ct. 1143, 166 L.Ed.2d 907 (2007). *See also Brown v. Secretary of Dept. of Health and Human Services,* No. 00–0182, 2005 WL 2659073, at *2 (Fed.Cl. Sept. 21, 2005) ("The present value of a future stream of payments may be thought of as the lump-sum amount that, if invested today, together with interest earnings would be just enough to meet each of the payments as they fell due") (quoting 2005 Annual Report of the Board of Trustees of the Federal Old—Age and Survivors Insurance and Disability Insurance Trust Funds, H.R. Doc. No. 109–18, at 200–01 (2005), *available at http://www. socialsecurity.gov/OACT/TR/TR05/VI glossary.html).*

Likewise, in the *Miller* case decided by the Court of Appeals for the Ninth Circuit, which involved the same Plan as the one at issue here, that court held that "Xerox's method of calculating the offset" using the phantom account "violate[d] ERISA by overestimating the value of distributions made upon a previous separation from employment," but the court nonetheless indicated that there should have been *some* appreciated offset, stating that "[t]he benefit properly attributable to the Profit Sharing Plan distributions is simply the Income Guarantee Plan annuity amount that those distributions would have provided" had each recipient used the distribution to purchase an annuity payable at normal retirement age. *Miller I,* 464 F.3d at 875 (emphasis omitted).

On remand in *Miller,* the district court noted that "[a]t no point during the *Frommert* litigation has there been any question as to whether *some* offset may be applied, even where the 'phantom account' offset method may not be," because Plan documents dating back to the 1980s reflected the disclosure of some offset. *Miller v. Xerox Corp. Retirement Income Plan* ("*Miller II* "), No. 98–10389, Dkt. # 134 at 8 (C.D.Cal. Sept. 22, 2010). The court went on to conclude that "[s]ome offset based on the prior lump sum distribution must be applied, as it was adequately disclosed prior to Plaintiffs' rejoining Xerox," and the court "order[ed] the application of an offset equal to the actuarial equivalent of the prior ... lump sum distributions. . . ." *Id.* at 9. In so doing, the court found that "the RIGP Plan Administrator's proposal [which was the same as the Administrator's proposed approach in the case at bar] is reasonable and reaches as nearly as possible the actuarial equivalent of the prior lump sum distribution." *Id.* at 13.

In support of their motion to reenter judgment in this case, and in opposition to defendants' cross-motion for adoption of the Plan Administrator's approach, plaintiffs have proposed their own alternatives, such as not using *any* appreciated offset, or utilizing a so-called "new hire" methodology. *See* Dkt. # 205 at 20. In short, plaintiffs are asking this Court to do exactly what I did in my 2007 decision, which was found by a majority of the Supreme Court to have been in error. This Court's 2007 decision was in direct response to the Second Circuit's remand which recognized the difficult task involved in calculating benefits and suggested that this Court "employ equitable principles ..." in fashioning the remedy for Xerox's improper use of the phantom account. *Frommert I,* 433 F.3d at 268. That is exactly what this Court attempted to do but the Supreme Court's majority wagged its collective finger and said "No."

In spite of that well-known history, plaintiffs still contend here that I could decline to adopt the Plan Administrator's

approach, and render the same decision I did in 2007, albeit on different grounds. Plaintiffs argue at some length about why their proposals are preferable or more reasonable or better than the Administrator's.

The issue before me at this point, however, is not whether the *plaintiffs* have offered a reasonable interpretation of the Plan, but whether the Plan Administrator has. The Supreme Court made it quite clear that this Court should defer to the Administrator's views in this matter, which means that the Court should accept his approach, unless it is patently unreasonable.

In that regard, plaintiffs have also leveled various criticisms at the Administrator's proposal. *See, e.g.*, Dkt. # 217, # 233. For example, plaintiffs take issue with the Administrator's use of discount rates set by the federal Pension Benefit Guaranty Corporation ("PBGC") in determining the actuarial equivalence between prior distributions and future annuities. I find the use of those rates to be reasonable, however, inasmuch as they are derived from data on market interest rates, *see Berger*, 338 F.3d at 760, and since the 1989 Restatement of the Plan specified the use of those rates for converting certain benefits to annuities. *See* 1989 Restatement (Dkt. # 133–6) §§ 4.3(e), (f), 8.2(c). *See also Miller II*, Dkt. # 134 at 11–12 (concluding that Administrator's use of PBGC rate in determining what annuity would have been available at time of plaintiffs' lump-sum payments in 1983 was reasonable).

Plaintiffs have raised a host of other arguments why the Administrator's approach conflicts with both ERISA and the terms of the Plan, and why in their view it is arbitrary and capricious. I will not separately address each of those arguments, but in general I disagree with those arguments and find that the Administrator's present position is a reasonable attempt to apply the Plan in a way that takes into account plaintiffs' prior distributions, consistent with what was disclosed to plaintiffs in the Plan summaries, restatements and other communications. As Becker states in his affidavit, the Administrator's approach, by offsetting the accrued benefit by the actuarial equivalent of the prior distribution, "permit[s] a comparison of benefits *expressed in the same form*—that is, [it] permit[s] an 'apples to apples' comparison." Becker Aff. ¶ 11. Again, I find that approach to be not unreasonable, and entitled to deference. *See Miller II*, Dkt. # 134 at 13–14 (adopting the Administrator's proposed approach as a "reasonable implementation of the Ninth Circuit's mandate to calculate the actuarial equivalent of the prior lump sum distribution"). *See also Conkright*, 559 U.S. at ——, 130 S.Ct. at 1651 (noting with apparent approval that "[i]n similar litigation over the Plan, the Ninth Circuit also rejected the use of the phantom account method, but held that the Plan Administrator should utilize actuarial principles in accounting for rehired employees' past distributions—which would presumably include taking some cognizance of the time value of money") (citing *Miller I*, 464 F.3d at 875–876).[5]

---

**5.** Robert Testa, the lead plaintiff in the *Testa* action, has filed a motion for leave to file an *amicus curiae* brief in *Frommert*. In his proposed *amicus* brief, Testa addresses what he terms "a secondary issue" concerning Plan interpretation. Dkt. # 216–2.

Whether to accept or reject an *amicus* filing lies entirely within a district court's discretion. *See Picard v. Greiff*, 797 F.Supp.2d 451, 452 (S.D.N.Y.2011); *Citizens Against Casino Gambling in Erie County v. Kempthorne*, 471 F.Supp.2d 295, 311 (W.D.N.Y.2007). Here, I see no need for further briefing. To say that the issues here have been amply briefed by the parties is an understatement. Testa's motion is therefore denied.

Several other points bear mentioning. First, plaintiffs contend that the Supreme Court's recent decision in *CIGNA Corp. v. Amara*, —— U.S. ——, 131 S.Ct. 1866, 179 L.Ed.2d 843 (2011), "makes clear that Plaintiffs' Motion to Re–Enter Judgment must be granted and Xerox's Cross–Motion summarily denied based precisely on the notice grounds raised by plaintiffs in their papers." Dkt. # 226 at 1. The Court in *Amara* addressed a number of issues concerning the effect to be given to plan summaries, whether a showing of "detrimental reliance" is a prerequisite for equitable relief in ERISA actions, and the statutory basis for such relief. *Id.* at 1877–82. *Amara* did not, however, effect a change in the law relative to this case, nor did it represent a departure from the principles on which the Supreme Court's *Conkright* decision rested.

Plaintiffs contend that the Court in *Amara* held that plan amendments not preceded by proper notice are invalid. Actually, the Court, in outlining the history of the *Amara* litigation, simply stated that the district court in that case had "noted that § 204(h) [29 U.S.C. § 1054(h) ] had

been interpreted by the Second Circuit to permit the invalidation of plan amendments not preceded by a proper notice, prior to the 2001 amendment that made this power explicit." 131 S.Ct. at 1874 (citing *Amara v. CIGNA Corp.*, 559 F.Supp.2d 192, 207 (D.Conn.2008), and *Frommert I*, 433 F.3d at 263).

Aside from the fact that this statement in *Amara* is dictum, *see Amara*, —— U.S. at ——, 131 S.Ct. at 1884 (characterizing as "blatant dictum" the Court's statements concerning the availability of compensation for plan members who have been "misled by an SPD") (Scalia, J., concurring in the judgment), it does not require a different result here. There has never been any dispute in this case that a misleading SPD, or a lack of notice prior to a purported plan amendment, can give rise to a cause of action under ERISA, or that a court has the power to fashion a remedy for such violations. The issue before me, rather, is simply whether the Administrator's current proposed interpretation of the Plan is reasonable in light of the notice that *was* given here. I find that it is.[6]

In any event, even were to Court to grant Testa's motion for leave to file an *amicus* brief, that would not change the result here. The plaintiffs in the *Miller* case from the Ninth Circuit—who are represented by the same counsel as Testa—raised similar arguments in that case, which were rejected by the district court. *See Miller II*, Dkt. # 134 at 9. Despite Testa's argument that *Miller* is both distinguishable from the case at bar and wrongly decided, I agree with that court's reasoning and conclusion that § 9.6 of the Plan adequately disclosed the offsets utilized by the Administrator's current proposal. *See id.* at 9 and n. 5 (stating that the court "d[id] not perceive any material difference" between that case and *Frommert* with respect to this issue and that the court could "conceive of no way" in which the Plan Administrator could have come up with a different proposal, particularly since the Supreme Court had "viewed favorably" the Plan Administrator's

proposal in *Frommert*, and held that the proposal should have been given deference).

**6.** I also note that the *Amara* Court expressly limited its holding to a relatively narrow issue concerning "the standard of prejudice," and, in so doing, the Court pointed out that it had "not [been] asked to reassess the evidence" or "about the other prerequisites for relief." 131 S.Ct. at 1882. The Court stated that "[w]hether or not the general principles we have discussed above are properly applicable in this case is for [the district court] or the Court of Appeals to determine in the first instance." *Id. See also Engers v. AT & T, Inc.*, —— Fed.Appx. ——, —— n. 9, No. 10-2752, 2011 WL 2507089, at *4 n. 9 (3d Cir. 2011) (stating that "the Court [in *Amara* ] expressly declined to address 'other prerequisites' for equitable relief," and finding "no reason to depart from our longstanding rule that an equitable estoppel claim under § 502(a)(3) cannot be based merely on simple

## IV. Notice

■ I also find unpersuasive plaintiffs' suggestion that the Court should reject the Administrator's approach on notice grounds. As plaintiffs correctly point out, the Supreme Court expressly declined to address the notice issue in this case, stating in a footnote:

The Government raises an additional argument—that the District Court should not have deferred to the Plan Administrator's second interpretation of the Plan [*i.e.*, the interpretation advanced by the Administrator following the Second Circuit's earlier remand] because that interpretation would have violated ERISA's notice requirements. That is an argument about the merits, not the proper standard of review, and we leave it to be decided, if necessary, on remand.

*Id.* at 1652 n. 2. On remand, plaintiffs have pressed this argument, contending that this Court should reject the Administrator's proposed interpretation on the ground that plaintiffs were never provided adequate notice of any "appreciated" offset to their pension benefits. *See* Plaintiffs' Mem. (Dkt. # 205) at 3.

In considering this argument, the Court must bear in mind both the substance of, and the reasons for, ERISA's notice requirements. In that regard, there is no dispute that ERISA does impose stringent notice requirements on plan administrators. The statute requires, for instance, that all plan participants and beneficiaries be provided with a plan summary containing certain specified information about the plan and plan benefits, "written in a manner calculated to be understood by the average plan participant, and ... sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan." 29 U.S.C. § 1022(a). Similarly, a "summary of any material modification in the terms of the plan ... shall be written in a manner calculated to be understood by the average plan participant...." *Id.*

Section 504(h) of ERISA, 29 U.S.C. § 1054(h), also provides that any plan amendment that "provide[s] for a significant reduction in the rate of future benefit accrual" must be preceded by written notice to plan participants and beneficiaries. When the phantom-account provisions were added to the Plan here, § 504(h) provided that a pension plan "may not be amended so as to provide for a significant reduction in the rate of future benefit accrual, unless, after adoption of the plan amendment and not less than 15 days before the effective date of the plan amendment, the plan administrator provides a written notice, setting forth the plan amendment and its effective date," to plan participants. 29 U.S.C. § 1054(h) (2000).[7]

Courts have likewise recognized that "adequate disclosure to employees is one of ERISA's major purposes." *Jobe v. Medical Life Ins. Co.*, 598 F.3d 478, 483 (8th Cir.2010); *see also Wilkins v. Mason*

ERISA reporting errors or disclosure violations, such as a variation between a plan summary and the plan itself, or an omission in the disclosure documents, without a showing of extraordinary circumstances") (additional internal quotation marks omitted) (unpublished decision).

7. In its current iteration, § 504(h) provides, *inter alia*, that "within a reasonable time before the effective date of the plan amend-

ment," an amendment that "provide[s] for a significant reduction in the rate of future benefit accrual" must be preceded by written notice that is "written in a manner calculated to be understood by the average plan participant," and which "provide[s] sufficient information ... to allow applicable individuals to understand the effect of the plan amendment." 29 U.S.C. § 1054(h) (2011).

*Tenders Dist. Council Pension Fund,* 445 F.3d 572, 581 (2d Cir.2006) (noting "ERISA's purpose of ensuring adequate disclosure with respect to pension and welfare plans"); *Izzo v. ING Life Ins. and Annuity Co.,* 235 F.R.D. 177, 187 (E.D.N.Y.2005) (stating that ERISA's disclosure requirements were "established by Congress for the purposes of 'ensuring that the individual participant knows exactly where he stands with respect to the plan'") (quoting *Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 118, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989)) (additional internal quotation marks omitted).

██ Changes that adversely affect a participant's or beneficiary's benefits are of particular concern under ERISA. Prior notice of such changes is required, "to give plan participants 'the opportunity to take advantage of an existing benefit before it is lost.'" *Scott v. Administrative Committee of the Allstate Agents Pension Plan,* 113 F.3d 1193, 1202 (11th Cir.1997) (citing *Davidson v. Canteen Corp.,* 957 F.2d 1404, 1407 (7th Cir.1992)). *See also Frommert I,* 433 F.3d at 266 ("§ 204(h) ... clearly required the Plan administrators to ... give participants the opportunity to take timely action in response to [an] amendment" that would reduce their rate of future benefit accrual) (internal quotation marks omitted).

Applying those principles in this case, the Second Circuit held in *Frommert I* that the 1998 SPD was effective as to employees rehired after its issuance, but not as to employees hired before then. The court held that Xerox's 1995 Benefits Update "was insufficiently 'accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan,'" 29 U.S.C. § 1022(a), and that "while the amendment adding the phantom account was fully disclosed[ in the 1998 SPD], it

was not preceded by fifteen days notice to Plan participants. Without such proper notice to Plan participants, the amendment was ineffective as to them." 433 F.3d at 267. Again, the Supreme Court did not squarely address those holdings.

Also significant, however, is what the Court of Appeals did *not* decide in this regard. Even as to employees rehired before 1998, the court did not forbid *any* use of an appreciated offset, or state that an approach utilizing such an offset could never be reasonable. And certainly the court did not address—indeed, had no occasion to address—the interpretation now offered by the Plan Administrator, which was not put forward by the Administrator until after the Court of Appeals' remand to this Court. The Second Circuit dealt only with the issue of whether, or when, the phantom account formula was adequately disclosed to participants.

In remanding, the Court of Appeals left it up to this Court to determine how plaintiffs' benefits should be calculated, based on "equitable principles." In so holding, the court also "recognize[d] the difficulty that this task poses because of the ambiguous manner in which the pre-amendment terms of the Plan described how prior distributions were to be treated." *Id.* at 268. Plaintiffs now contend that the application of "equitable principles" should lead this Court to direct that *no* appreciated offset should be applied.

That argument is unpersuasive. For one thing, the legal landscape has changed considerably since the Second Circuit issued that decision in 2006. The Supreme Court has now held that this Court should give deference to the Plan Administrator with respect to the interpretation and application of the Plan. I conclude that the Administrator's proposal, by reducing both the participant's benefit and the prior distribution to an annuity payable at retire-

ment age, is equitable, particularly since, as explained above, participants were on notice at all relevant times that *some* offset would be applied to account for prior distributions. Before 1998, the disclosure of an offset may have been provided in an "ambiguous manner," but it is precisely in such situations that deference is owed to a plan administrator who has been granted discretion to interpret the terms of a plan. *See, e.g., Firestone,* 489 U.S. at 111, 109 S.Ct. 948 *Weber v. GE Group Life Assur. Co.,* 541 F.3d 1002, 1011 (10th Cir.2008); *Williams v. Interpublic Severance Pay Plan,* 523 F.3d 819, 821 (7th Cir.2008). To hold otherwise in this case would, as the Supreme Court has pointed out, grant a windfall to plaintiffs, by placing them in a better position than employees who never left Xerox in the first place. *Conkright,* 559 U.S. at ——, 130 S.Ct. at 1650.

In addition, the Second Circuit's concerns about insufficient notice with respect to the phantom account do not apply as to the Administrator's current interpretation, which does not utilize any phantom account. The SPDs and Plan documents *did* notify participants, at all relevant times, that some offset would be implemented to account for prior distributions. *See Frommert I,* 433 F.3d at 257 ("the Plan has always contained provisions concerning the offset of prior distributions"); *see, e.g.,* 1989 Plan Restatement (Dkt. # 133–6) at § 9.6 (providing that "[i]n the event any part of or all of a Member's accrued benefit is distributed to him prior to his Normal Retirement Date, if … such Member at any time thereafter recommences active participation in the Plan, the accrued benefit of such Member based on all Years of Participation shall be offset by the accrued benefit attributable to such distribution"). It is now established for purposes of this lawsuit that prior to 1998, the Plan did not adequately inform participants of the existence or operation of the phantom account,

but it is equally well established that plaintiffs were on notice at all relevant times that there would be *some* offset.

The fact that the Plan documents did not spell out exactly how the offset would be applied does not mean that the Administrator's current proposal runs afoul of ERISA's notice requirement. For one thing, it is not necessary that a plan summary describe every facet of the plan in detail. As the Seventh Circuit has observed, "[l]arding the summary with minutiae would defeat that document's function: to provide a capsule guide in simple language for employees." *Herrmann v. Cencom Cable Assoc., Inc.,* 978 F.2d 978, 984 (7th Cir.1992). Likewise, the Second Circuit has explained that the SPD may "summarize, rather than describe in every detail, the benefits available under an employee pension benefit plan," and that a plan summary need not "invariably … describe or illustrate the method by which a specific retirement benefit is actuarially reduced in a particular circumstance," so long as it discloses the circumstances under which benefits may be reduced, and does not confuse, mislead, or misinform participants. *McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184, 194–96 (2d Cir. 2007).

■ Moreover, as the Ninth Circuit explained in *Miller I,* ERISA itself "requires actuarial equivalence between the actual distribution and the accrued benefit it replaces." 464 F.3d at 874. While plaintiffs could not be expected to have been intimately familiar with the nuances of ERISA law, the point is that they were on notice that there would be some offset to account for their prior distributions, and the Administrator's current proposal effectuates that offset in a reasonable manner, by accounting for the time value of money and avoiding a windfall to plaintiffs. *See*

*also Prudential Ins. Co. v. S.S. American Lancer,* 870 F.2d 867, 871 (2d Cir.1989) (stating that "equity ... abhors a windfall"). From the notice given to them, plaintiffs could not reasonably have expected more than that. Indeed, as the Supreme Court explained in this case, any interpretation of the Plan that does not account for the time value of the prior distribution would, "[i]n the actuarial world," be "heresy, and highly unforeseeable." *Conkright,* 559 U.S. at ——, 130 S.Ct. at 1650. The SPDs here adequately conveyed the existence of the offset that the Administrator has now proposed.[8]

In contrast to the Administrator's proposal, then, plaintiffs' suggestion that this Court should not apply *any* appreciated offset is, in light of the Supreme Court's decision in this case, *un* reasonable. In effect, plaintiffs would have this Court do exactly what it did before, *i.e.,* to adopt an approach under which plaintiffs' "present benefits [would be] reduced only by the nominal amount of their past distributions—thereby treating a dollar distributed to [plaintiffs] in the 1980's as equal in value to a dollar distributed today." *Conkright,* 559 U.S. at ——, 130 S.Ct. at 1645. The Supreme Court expressly rejected that approach, and I decline to adopt it again.

## V. Conflict of Interest

 Plaintiffs have also argued that the Court should not adopt the Administrator's approach unless and until plaintiffs have been permitted to conduct discovery concerning whether the Administrator is operating under a conflict of interest, and to what extent any such conflict may have affected his decision to adopt his current Plan interpretation.

I reject that assertion. There has been extensive discovery in this case, during which plaintiffs never requested discovery on any purported conflict issue. Although following the July 2006 remand hearing, the Supreme Court held in *Glenn,* 554 U.S. 105, 128 S.Ct. 2343, that an administrator's conflict of interest is a factor for a court to consider when evaluating whether the plan administrator abused his discretion, that is of no moment here. For one thing, *Glenn* simply "reaffirmed the general proposition that a plan administrator that both evaluates claims for benefits and pays benefits claims creates an inherent conflict of interest." *Badawy v. First Reliance Standard Life Ins. Co.,* 581 F.Supp.2d 594, 602 (S.D.N.Y.2008). In that regard, *Glenn* did not create new law in this circuit. *See, e.g., Lee v. Aetna Life and Cas. Ins. Co.,* No. 05 Civ. 2960, 2006 WL 345854, at *3 (S.D.N.Y. Feb. 13, 2006) ("there is no dispute that Aetna is a conflicted administrator as the company both makes the disability determination and also pays out on the policy").

Second, "*Glenn* ... overturn[ed] Second Circuit law providing for *de novo* review when plaintiff can demonstrate that the conflict actually influenced the benefits determination." *Id.* (citing *Pulvers v. First*

8. Plaintiffs argue that they, too, have proposed an annuity-based offset that incorporates the time value of money *See* Plaintiffs' Opposition to Defendants' Cross–Motion (Dkt. # 217) at 19. That proposal is based on their expert's interpretation of the Plan as requiring an offset based on each participant's accrued benefit under Xerox's defined benefit plan at the time of the distribution, rather than the benefit actually received from the defined contribution plan. *See* July 11, 2006 Remand Hearing Transcript (Dkt. # 127) at 48–58. Again, that may be an arguably reasonable interpretation of the Plan, but the fact remains that this involves an issue of plan interpretation, with respect to which the Court must defer to the Administrator, and I find the Administrator's contrary interpretation to be at least equally reasonable.

*UNUM Life Ins. Co.*, 210 F.3d 89, 92 (2d Cir.2000)). In other words, *Glenn* actually *relaxed* the standard of review in such situations, holding that "the existence of a conflict is just one 'factor' among many that may serve as a 'tiebreaker' when other considerations are in equipoise, or may have greater or lesser strength independently if there is evidence that the conflict had a greater or lesser impact on the benefits determination." *Id.* (quoting *Glenn*, 554 U.S. at 117, 128 S.Ct. 2343). *See also McCauley v. First Unum Life Ins. Co.*, 551 F.3d 126, 133 (2d Cir.2008) ("Following *Glenn*, a plan under which an administrator both evaluates and pays benefits claims creates the kind of conflict of interest that courts must take into account and weigh as a factor in determining whether there was an abuse of discretion, but does not make *de novo* review appropriate") (citing *Glenn*, 128 S.Ct. at 2348).

Third, even before *Glenn* it was the law in this circuit that "discovery may be appropriate in some cases where a petitioner seeks to show a conflict of interest." *Wagner v. First Unum Life Ins. Co.*, 100 Fed. Appx. 862, 864 n. 1 (2d Cir.), *cert. denied*, 543 U.S. 958, 125 S.Ct. 416, 160 L.Ed.2d 320 (2004); *accord Zervos v. Verizon New York, Inc.*, 252 F.3d 163, 174 (2d Cir.2001). Thus, there is no reason that plaintiffs could not have raised this issue sooner, had they believed there was any basis to do so. Plaintiffs' belated assertion that they need discovery regarding the conflict issue is not persuasive, particularly since plaintiffs have failed to offer anything more than vague speculation concerning the extent to which the Administrator's interpretation of the Plan has been affected by a conflict of interest.

In addition, under *Glenn*, even where the administrator is acting under a conflict, in the sense that he both decides and pays out claims, the standard of review remains deferential where, as here, the plan grants the administrator discretion to construe its terms. *See Glenn*, 554 U.S. at 116–17, 128 S.Ct. 2343 (holding that under trust law principles, courts should apply a deferential standard of review to the discretionary decisionmaking of a conflicted plan administrator, while taking account of the conflict when determining whether the administrator has abused his discretion); *Lopes v. First Unum Life Ins. Co.*, No. 09–CV–2642, 2011 WL 1239899, at *4 (E.D.N.Y. Mar. 30, 2011) ("The presence of a conflict of interest does not change the standard of review from deferential to *de novo*," but "[r]ather ... should act as a 'tiebreaker' " when other factors are equally balanced); *In re FedEx Ground Package System, Inc.*, 722 F.Supp.2d 1033, 1047 (N.D.Ind.2010) ("When the terms of a plan grant discretionary authority to the plan administrator, a deferential standard of review remains appropriate even in the face of a conflict," although "[t]he court must weigh the conflict as a factor when determining whether there was an abuse of discretion") (citing *Glenn* ). Even taking this conflict into account, I find the Administrator's interpretation of the Plan to be reasonable, and entitled to deference.

## VI. Plaintiffs' Releases

 In its 2008 decision, the Second Circuit held that this Court had erred in holding that the releases signed by eighteen of the *Frommert* plaintiffs were unenforceable.[9] Each of the releases at issue

9. As the Court of Appeals explained, 22 of the named plaintiffs in *Frommert* signed release forms, but four of them amended their forms to carve out explicitly their claims as members of the "Frommert lawsuit" from the universe of claims to be covered by the release. *See Frommert II*, 535 F.3d at 120 n. 3 (citing *Frommert*, 472 F.Supp.2d at 460). On appeal, defendants did not challenge this Court's conclusion that those four individuals'

contained the statement, "I release Xerox from any and all claims, even if I don't know about the claim at this time, based on anything that has occurred prior to the date I sign this Release." Dkt. # 133–7 Ex. D. The releases then listed several examples of the types of claims that the employee agreed to release, including claims under ERISA. In return for those releases, the employees received as consideration up to fifty-two weeks of salary continuance. *Id.*

Applying the relevant factors to the undisputed facts, the Court of Appeals in *Frommert II* concluded that "[u]nless the release form at issue specifically exempted this litigation ..., the releases signed by certain Plaintiffs–Appellees are enforceable." 535 F.3d at 123. That holding was not addressed by the Supreme Court in its decision in this case.

In a letter to the Court concerning the status of these cases, plaintiffs' counsel state with respect to the releases that "[t]he Second Circuit's decision regarding releases will need to be interpreted," that "discovery may be necessary," and that "[a]dditional briefing may then be called for to address how the standards enunciated by the Second Circuit apply when all relevant documents and facts pertaining to each Plaintiff are brought to light." Dkt. # 35 at 2.

I fail to see what part of the Second Circuit's decision with respect to the releases needs to be "interpreted," or why any discovery is needed as to this issue. The Court of Appeals' decision in this regard could hardly have been clearer:

> Applying the factors ... relevant to the issue of whether a waiver of ERISA rights was knowing and voluntary and reviewing the undisputed facts pertain-

ing to these releases under the totality of the circumstances, we conclude that the District Court erred in holding that the releases at issue were unenforceable. There appears to be no dispute that those Plaintiffs–Appellees who signed these releases had ample time (45 days) to decide whether to sign the release, that Xerox encouraged such individuals to consult an attorney, and that the signatories received salary continuances in consideration of their releasing claims. Some Plaintiffs–Appellees even modified the terms of the release forms with which they had been presented before signing them.... Unless the release form at issue specifically exempted this litigation as noted above, the releases signed by certain Plaintiffs–Appellees *are enforceable.*

*Frommert II,* 535 F.3d at 122–23 (emphasis added).

As to the eighteen plaintiffs in *Frommert* who signed the unaltered releases, then, the releases are enforceable, and bar those plaintiffs' claims here. The release forms expressly referenced ERISA claims, and by signing those forms, those eighteen plaintiffs agreed not to bring claims of the type asserted in this action. Although this Court previously found that the releases were ambiguous in one respect, the Second Circuit has unequivocally held otherwise, and that aspect of the Court of Appeals' decision was left intact by the Supreme Court.

## VII. Joseph McNeil's Motion to Intervene

 Joseph McNeil, a plaintiff in the *Kunsman* action, has filed a motion to intervene in *Frommert.* McNeil has stat-

---

release forms did not cover their ERISA claims in this action, and the Second Circuit therefore let stand this Court's conclusion

that the release forms do not bar the ERISA claims asserted by those four plaintiffs in this litigation. *Id.*

ed in his motion papers that he believes that intervention is needed to ensure that Xerox will treat similarly situated plan participants in a similar fashion.

As the Court stated at oral argument, however (a statement with which his counsel agreed, *see* Tr., Dkt. # 236 at 86), whatever rights McNeil has, or whatever defenses to his claims defendants may have, can be litigated in *Kunsman* just as well as in *Frommert*. That includes McNeil's argument that Xerox should not be allowed to assert a statute of limitations defense against him or other plaintiffs in *Kunsman* or the other actions. I see no prejudice, much less unfair prejudice, to McNeil by requiring him to litigate the relevant issues in *Kunsman* rather than in *Frommert*. McNeil's motion for leave in intervene in *Frommert* is therefore denied.

## VIII. Other Motions

Plaintiffs have filed several other motions in this case that remain pending, which generally have been mooted by events since their filing. These include a motion for declaratory judgment and interest (Dkt. # 181), a motion for sanctions (Dkt. # 184), and a motion for interim fees and costs (Dkt. # 186).

The declaratory judgment motion, which was filed in 2009, sought an order effectuating this Court's 2007 remedy decision, and entering judgment for the plaintiffs. The Supreme Court's decision has obviously rendered such relief inappropriate.

In their sanctions motion (which could perhaps better be characterized as a motion for an order holding defendants in contempt), plaintiffs alleged that defendants, in bad faith, had been deliberately dragging their feet with respect to paying the named plaintiffs the benefits due them under this Court's 2007 decision, and the Second Circuit's 2008 decision affirming my ruling as to the methodology for calculating plaintiffs' benefits. Plaintiffs sought an order directing the Plan Administrator to pay $1000 per day to plaintiffs' counsel until all plaintiffs' benefits had been paid. Dkt. # 184–5.

Again, the Supreme Court's decision has effectively knocked the legs out from under plaintiffs' arguments in that regard. The decisions of this Court and of the Court of Appeals on which plaintiffs relied have now been overturned by the Supreme Court. In any event, having reviewed defendants' response (Dkt. # 190) to the sanctions motion, I am not convinced that defendants did act in bad faith, or that the relief requested in the motion was warranted, even prior to the Supreme Court's decision.

The motion for interim fees and costs, which was also filed in 2009, sought over $2 million in attorney's fees, based on the work performed by plaintiffs' counsel up to that point. Although there is authority for granting an award of interim attorney's fees in ERISA cases, under certain circumstances, *see Kayes v. Pacific Lumber Co.*, 51 F.3d 1449, 1469 (9th Cir. 1995) (holding that "interim attorney's fees are available under ERISA to the extent that they are available under civil rights statutes"); *see also Marriott v. County of Montgomery*, 426 F.Supp.2d 1, 12–13 (N.D.N.Y.2006) (awarding interim fees in civil rights case), a prerequisite for such an award, just as with an award following the end of a case, is that the moving party "prevailed" as to at least some of his claims. *See, e.g., Hanrahan v. Hampton*, 446 U.S. 754, 758, 100 S.Ct. 1987, 64 L.Ed.2d 670 (1980) ("Congress intended to permit the interim award of counsel fees [under 42 U.S.C. § 1988] only when a party has prevailed on the merits of at least some of his claims") (per curiam); *Singer Mgmt. Consultants, Inc. v. Milgram*, 650

F.3d 223, 229 (3d Cir.) ("to be entitled to prevailing party fees based on interim relief, relief must be derived from some determination on the merits") (internal quotation marks omitted), *cert. denied,* —— U.S. ——, 132 S.Ct. 500, 181 L.Ed.2d 347 (2011).

■■■ Where a party has prevailed on some issue or claim, but the case is still ongoing, subsequent events in the litigation can vitiate the party's "prevailing" status. *See, e.g., Sole v. Wyner,* 551 U.S. 74, 86, 127 S.Ct. 2188, 167 L.Ed.2d 1069 (2007) (plaintiff was not a prevailing party for purposes of eligibility for attorney's fee award, where she obtained a preliminary injunction, but district court later denied permanent injunction). While I express no opinion at this point as to the degree to which plaintiffs may be considered to have prevailed in this action, clearly they do not stand on the same footing in that regard as they did prior to the Supreme Court's decision in this case. Accordingly, any motions for attorney's fees must await the entry of a final judgment in this case, following the entry of this Decision and Order.

### CONCLUSION

Plaintiffs' motions for declaratory judgment and interest (Dkt. # 181), motion for sanctions (Dkt. # 184) are denied.

Plaintiffs' motion to reenter judgment (Dkt. # 204, # 205) is granted in part and denied in part.

Defendants' cross-motion (Dkt. # 211) for an order affirming the Plan Administrator's interpretation of the Plan and for other relief is granted.

Defendants are hereby directed to calculate and pay plaintiffs retirement benefits, without utilizing a so-called "phantom account," in accordance with the methodology set forth in the affidavit of Lawrence M. Becker sworn to on June 26, 2006 (Dkt. # 211–2), except as to the following plaintiffs, who signed written forms releasing defendants from their claims: Matthew D. Alfieri; William M. Burritt; William F. Coons; Bruce D. Craig; Richard C. Crater; John L. Crisafulli; Deborah J. Davis; Charles R. Drannbauer; Carol E. Gannon; James D. Gagnier; Janice R. Heiler; Charles Hobbs; Gerald A. Leonardo, Jr.; Charles J. Maddalozzo; Walter J. Petroff; Kenneth W. Pietrowski; Irshad Qureshi; and John A. Williams. The claims of those eighteen plaintiffs are dismissed.

Plaintiffs' motion for interim attorney's fees and costs (Dkt. # 186) is denied without prejudice to plaintiffs' seeking attorney's fees and costs following the entry of a final judgment in this case.

Joseph McNeil's motion for leave to intervene (Dkt. # 167) is denied.

The motion for leave to file a brief as *amicus curiae* by Robert Testa (Dkt. # 216) is denied.

IT IS SO ORDERED.